# VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Thursday the 19th day of April, 2018.*

Present: All the Justices

Commonwealth of Virginia,                                                          Appellant,

 against           Record No. 170437
                     Court of Appeals No. 1040-15-1

Marquez Rah-Shaun Perkins,                                                        Appellee.

Upon an appeal from a judgment rendered by the Court of Appeals of Virginia.

The trial court convicted Marquez Rah-Shaun Perkins of robbery, conspiracy to commit a felony, use of a firearm during the commission of a robbery, malicious wounding, and use of a firearm during the commission of a malicious wounding.[1]  In the Court of Appeals, Perkins unsuccessfully challenged his convictions for robbery, conspiracy to commit a felony, and use of a firearm during the commission of a robbery, but he successfully challenged the sufficiency of the evidence for his convictions for malicious wounding and use of a firearm during the commission of a malicious wounding, which the Court of Appeals reversed.

The Commonwealth appeals, arguing that the Court of Appeals erred in reversing the two convictions related to malicious wounding because a rational factfinder could infer from the evidence that Perkins attacked the victim with the requisite intent to maliciously wound him during the robbery.  We agree with the Commonwealth and reverse.

## I.

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."  *Vasquez v. Commonwealth*, 291 Va. 232, 236, 781 S.E.2d

---

[1] The trial court also convicted Perkins of possession of a firearm by a convicted felon and credit card theft but vacated these convictions sua sponte prior to sentencing.  The Commonwealth did not appeal the vacation of these convictions.

920, 922 (citation omitted), *cert. denied*, ___ U.S. ___, 137 S. Ct. 568 (2016). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Bowman v. Commonwealth*, 290 Va. 492, 494, 777 S.E.2d 851, 853 (2015)).

So viewed, the evidence at trial showed that in the afternoon on March 4, 2014, Otis White, Jr. went to visit Perkins's mother at her apartment. White had known her for 35 years, but he had only known Perkins[2] for 3 to 4 months. At the time of his visit, White had "a little over five thousand dollars" in his pants pocket that he had received as "back payment from social security disability" and a "wallet with [his] ID, Social Security Card," and a debit card that he used to cash his monthly benefits. J.A. at 8-9, 33. Perkins's mother, Perkins, Justin Williams, and "another young lady" were at the home when White arrived. *Id.* at 9-11. Perkins's mother was cooking, and Perkins, Williams, and the young lady were in a back room.

After speaking briefly with Perkins's mother, White went to the back room and talked to Perkins. They discussed Perkins's dog, and Perkins asked White for $20 to buy a dog bowl. White agreed, and he "tried to reach in [his] pocket just to pull a twenty out because [he] didn't want everybody to see how much money [he] had." *Id.* at 12. The money in his pocket was "folded like a wallet" with "hundreds on the outside and fifties and twenties on the inside," and when he "was pulling the twenty out, some of it came over top of [his] pocket." *Id.* at 12-13. Williams saw the money come out of White's pocket and then left the room for "five to ten minutes." *Id.* at 13. When Williams returned, he called Perkins out of the room, and they both went to the living room. About five minutes later, White left the back room to talk to Perkins's mother again, and he saw Perkins and Williams talking in the living room. When he passed them, "they stopped talking until [he] got past them" and then "started back talking again." *Id.* at 13-14.

Shortly thereafter, Perkins's mother and White left to buy something at the nearby convenience store. Before leaving, White moved his money into his jacket pocket. "It was getting dusk," and there was still some light outside. *Id.* at 16. At the edge of the apartment

---

[2] White also identified Perkins by the names "Muney," J.A. at 7, "Mooney," Commonwealth's Ex. 1a, or "Moonie," *id.* Ex. 4.

complex's parking lot, White "felt somebody walking behind [him]," and he turned around. *Id.* at 14. He saw Perkins "holding a pistol up in the air like he was about to hit [White]," and White smiled at Perkins who smiled back. *Id.* White did not think Perkins would do anything to him because he was walking with Perkins's mother. "Within five to ten seconds" after White turned back around and started walking again, Williams "hit [him] from the right on the side of [his] face." *Id.* at 15. "At the same time" that Williams hit White, White "got hit in the back of the head" with what he believed to be the pistol that he had just seen Perkins carrying. *Id.* White testified that Perkins "was on the left side" with Williams "on the right side" and that the hit to the back of his head "came from the direction" of where Perkins was standing. *Id.* White did not recall how many more times he was hit because he lost consciousness. When White woke up, it was dark outside, and he discovered that his money and wallet were gone. Perkins's mother, Perkins, and Williams also were gone. White was in pain. His eye had swollen shut, his ear was bleeding, and his lips were swollen. He walked to the convenience store and asked the cashier to call an ambulance.

The ambulance came and took White to the hospital, and a report from the emergency room documented his injuries. White's "right eye [was] swollen shut" with "slightly blurry" vision and a "small laceration on [the] eye lid," his "upper and bottom lip[s] [were] swollen" with "bleeding controlled," and he had a "small laceration by [his] right ear lobe" with bleeding controlled. Def.'s Ex. 1, at 3 (Jan. 29, 2015). White reported being "ass[a]ulted with [a] fist" and "hit in the occipital portion of his head with an unknown object." *Id.* at 2-3. He complained of "facial pain, eye pain, [a] tooth feeling loose and not fitting together normally for him," and "pain on [the] right side of [his] head." *Id.*

The Commonwealth entered into evidence several pictures posted on a public Facebook profile the day after the robbery. The pictures portrayed Williams and Perkins posing with a spread of money in similar denominations to those stolen from White during the robbery and Perkins posing individually with money. In one of the photos, White identified Perkins as the man "that hit me with the gun and robbed me" and Williams as "the other guy that hit me and help[ed] Mooney rob me." Commonwealth's Ex. 1a (altering capitalization). Williams, Perkins's 15-year-old co-conspirator, also confirmed in a statement to police that he and Perkins were portrayed in the pictures and that the money came from the robbery of White. Williams

3

also confirmed that he had seen Perkins with a firearm, but he did not specify exactly when he had seen Perkins with a firearm.

Following a bench trial, the trial court stated that it found White's testimony "extremely compelling and credible," J.A. at 52, and that it found the evidence sufficient to convict Perkins of malicious wounding based on White's testimony and the medical records submitted. The trial court also found the evidence sufficient to convict Perkins of robbery, conspiracy to commit a felony, use of a firearm during the commission of a robbery, and use of a firearm during the commission of a malicious wounding. The trial court sentenced Perkins to a total of 48 years of incarceration with 31 years suspended.

Perkins appealed to the Court of Appeals, which initially denied his petition in a one-judge, per curiam order, but a three-judge panel later granted his appeal. In an unpublished opinion, the Court of Appeals affirmed Perkins's convictions for robbery, conspiracy to commit a felony, and use of a firearm during the commission of a robbery but reversed his convictions for malicious wounding and use of a firearm during the commission of a malicious wounding. The Court of Appeals found that the trial court could not "infer[] an intent to cause permanent disability" and could not find "an inference of malice on the part of [Perkins] . . . from the extent of White's injuries" because Williams also struck White "when he was rendered unconscious." *Perkins v. Commonwealth*, Record No. 1040-15-1, 2017 Va. App. LEXIS 10, at *14 (Jan. 17, 2017). The Commonwealth appealed this decision, and we granted the appeal limited to the question of the sufficiency of the evidence for Perkins's convictions of malicious wounding and use of a firearm during the commission of a malicious wounding.

## II.

The Commonwealth challenges the decision of the Court of Appeals on the ground that "the Court of Appeals wrongly disregarded the trier of fact's factual finding that the defendant had acted with the requisite intent in striking the victim and rendering him unconscious during the robbery." Appellant's Br. at 3 (altering capitalization).

### A.

When reviewing the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512, 808 S.E.2d 408, 413 (2017) (quoting

Code § 8.01-680). In light of this presumption, this Court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Williams v. Commonwealth*, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "'Rather, the relevant question is,' upon review of the evidence in the light most favorable to the prosecution, 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pijor*, 294 Va. at 512, 808 S.E.2d at 413 (emphasis in original) (citation omitted). Thus, "it is not for this [C]ourt to say that the evidence does or does not establish his guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." *Cobb v. Commonwealth*, 152 Va. 941, 953, 146 S.E. 270, 274 (1929).

The judgment of the trial court, sitting without a jury, is "entitled to the same weight as a jury verdict." *Cole v. Commonwealth*, 294 Va. 342, 361, 806 S.E.2d 387, 397-98 (2017) (citation omitted). In a bench trial, a "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). It has long been deemed "an abuse of the appellate powers . . . to set aside a verdict and judgment, because [an appellate court], from the evidence as written down, would not have concurred in the verdict." *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 602 (1845). Virginia courts "have said on many occasions, 'If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Courtney v. Commonwealth*, 281 Va. 363, 368, 706 S.E.2d 344, 347 (2011) (alteration and citation omitted).

"The credibility of the witnesses and the weight accorded the evidence are matters *solely for the fact finder* who has the opportunity to see and hear that evidence as it is presented." *Elliott v. Commonwealth*, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009) (emphasis added). This Court must "accept the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518, 628 S.E.2d 922, 927 (2006) (citation omitted). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415, 626 S.E.2d 383, 417 (2006) (citation omitted).

B.

"To be convicted of malicious wounding, the Commonwealth must prove that the defendant maliciously stabbed, cut, or wounded 'any person *or* by any means cause[d] him bodily injury, with the intent to maim, disfigure, disable, or kill.'" *Burkeen v. Commonwealth*, 286 Va. 255, 259, 749 S.E.2d 172, 174 (2013) (emphasis added) (quoting Code § 18.2-51). The indictment in this case pleaded only bodily injury as the actus reus of the malicious wounding. *See* J.A. at 4. Bodily injury can be "*any bodily hurt* whatsoever" caused *by any means*. *Bryant v. Commonwealth*, 189 Va. 310, 316, 53 S.E.2d 54, 57 (1949) (emphasis in original) (quoting John B. Minor, Exposition of the Law of Crimes and Punishments 67 (1894)) (interpreting predecessor statute). Thus, "[t]o prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin" because the term bodily injury includes internal injuries. *Ricks v. Commonwealth*, 290 Va. 470, 478, 778 S.E.2d 332, 335 (2015) (quoting *English v. Commonwealth*, 58 Va. App. 711, 719, 715 S.E.2d 391, 395 (2011)).

The mens rea of the crime is an "intent to maim, disfigure, disable or kill," which may be pleaded conjunctively, but the Commonwealth "need prove only one intent to convict," 7 Ronald J. Bacigal, Virginia Practice Series: Criminal Offenses and Defenses 47-48 (2017-2018 ed.); *see also Angel v. Commonwealth*, 4 Va. (2 Va. Cas.) 231, 231-32 (1820) (upholding a conviction for mayhem when the jury found only an "intention to maim, disfigure and disable, but not [an] intention to kill" even though each of those intentions were pleaded in the indictment); Minor, *supra*, at 67 ("The indictment should allege the intent [to maim, disfigure, disable, or kill] in the conjunctive, but it is enough to prove either of the purposes." (emphases omitted)).[3] Whether the

---

[3] The distinctions between maiming, disfiguring, disabling, and killing further support the principle that the Commonwealth need prove only one intent under the statute. Maiming and disfiguring are different concepts. At common law, maiming was defined as "violently depriving another of the use of such of his members as may render him the less able, in fighting, either to defend himself or to annoy his adversary." 4 William Blackstone, Commentaries *205. Blackstone gives several examples of maims, such as "cutting off or disabling or weakening a man's hand or finger, or striking out his eye or foretooth," but "cutting off his ear or nose, or the like, are not held to be [maims] at common law, because they do not weaken but only disfigure him." *Id.*; *see also* 1 William Hawkins & John Curwood, A Treatise of the Pleas of the Crown 107 (8th ed. 1824). After a member of Parliament was attacked on the street by individuals who "slit his nose in revenge for obnoxious words uttered by him in Parliament," an early English statute (the "Coventry Act") expanded the common-law offense of mayhem to include disfiguring a victim for the reason that "cutting off [an] ear or nose did not constitute

crime is committed maliciously or merely unlawfully determines the gradation of intent necessary to convict someone of either a class 3 felony or a class 6 felony, respectively. *See* Code § 18.2-51. The indictment in this case pleads that Perkins acted "feloniously and maliciously." J.A. at 4. "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen*, 286 Va. at 259, 749 S.E.2d at 174; *see also* 7 Bacigal, *supra*, at 49 ("In general, this means that an intending, unprovoked accused who wounds or injures has acted maliciously . . . .").

"To be guilty of malicious wounding, a person must also intend to permanently, not merely temporarily, harm another person." *Burkeen*, 286 Va. at 259, 749 S.E.2d at 174 (alterations and citation omitted). "That is not to say," however, "that a permanent condition must be produced, but the intent to produce it must exist." 7 Bacigal, *supra*, at 48. "Intent is the purpose formed in a person's mind which may, *and often must*, be inferred from the facts and circumstances in a particular case." *Burton v. Commonwealth*, 281 Va. 622, 626-27, 708 S.E.2d 892, 894 (2011) (emphasis added) (citation omitted). "The state of mind of an alleged offender may be shown by his acts and conduct," *id.* at 627, 708 S.E.2d at 894, and "[i]t is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions," *Ellis v. Commonwealth*, 281 Va. 499, 507, 706 S.E.2d 849, 853 (2011). Thus, "[i]t is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Burkeen*, 286 Va. at 260-61, 749 S.E.2d at 175.

---

mayhem . . . because it did not result in permanent disablement." Rollin M. Perkins & Ronald N. Boyce, Criminal Law 238-40 (3d ed. 1982) (noting that "'[m]aim' is the modern equivalent of the old word 'mayhem,'" and further clarifying that the Coventry Act "did not displace the English common law of mayhem (malicious maiming) but . . . for the first time extended the crime to include disfigurement (if intentional)" (footnotes omitted)). The traditional definitions of maim, disfigure, and disable illustrate the differences between them. *See, e.g.*, Samuel Johnson, A Dictionary of the English Language (3d rev. ed. 1768) (defining maim as the "[p]rivation of some essential part" or "lameness, produced by a wound or amputation"; disfigure as "chang[ing] any thing to a worse form; to deform; to mangle"; and disable as "depriv[ing] of natural force," "usefulness or efficacy" or "[t]o impair; to diminish[;] . . . [t]o make [i]nactive" (altering archaic spelling)).

C.

On appeal, Perkins argues only that the evidence was insufficient for the trial court to infer the requisite intent or mens rea of malicious wounding. He makes no argument on appeal concerning the actus reus of the crime — whether Perkins caused bodily injury to White by any means. Perkins's sufficiency argument on appeal, to the extent that it addresses the specific circumstances of this case, consists of a single paragraph:

> In the case at bar, Perkins contends that the evidence failed to prove he acted with the requisite intent to be found guilty of malicious wounding. Perkins further contends that the evidence is insufficient to find him guilty of using a firearm in the commission of that offense. The evidence was insufficient to prove beyond a reasonable doubt that Perkins committed malicious wounding. The trial court found credible White's testimony that Perkins struck White in the head with a gun. Although the force of this blow was sufficient to injure White, one cannot say that this record contains sufficient evidence from which the trial court could have inferred an intent to cause permanent disability. Because White was also struck by Williams and fell to the ground when he was rendered unconscious, an inference of malice on the part of Perkins may not be drawn from the extent of White's injuries.

Appellee's Br. at 10-11. Perkins's counsel conceded on brief and at oral argument that the trial court found the evidence credible to support the finding that Perkins had struck White with a firearm and injured him. *See id.* at 11; Oral Argument Audio at 10:13 to 10:29 ("What we have is evidence from behind, the blow from the back of the head, presumably with the gun that knocks out the victim. There is no other evidence that my client did anything other than inflict this blow from behind."). Therefore, the only issue on appeal is the sufficiency of the evidence as to the trial court's finding of malicious intent to maim, disfigure, disable, or kill.

Intent can, and often must, be inferred from the act itself. "The color of the act determines the complexion of the intent only in those situations where common experience has found a reliable correlation between a particular act and a corresponding intent." *Banovitch v. Commonwealth*, 196 Va. 210, 217, 83 S.E.2d 369, 373 (1954). In the judgment of a rational factfinder, whether that "reliable correlation," *id.*, exists is purely a question of fact. In *Burkeen*, for example, we found that a rational factfinder could infer the intent to maliciously wound from a single blow to the face with a fist because "the victim did nothing to provoke the attack, and he was hit with extreme force in a vulnerable area of his body while he was defenseless and not

8

expecting such a blow." 286 Va. at 261, 749 S.E.2d at 175;[4] *see also Dominguez v. Pruett*, 287 Va. 434, 444-45, 756 S.E.2d 911, 916-17 (2014).

Here, sitting as factfinder, the trial court made a similar inference about Perkins's intent. Unprovoked, Perkins struck White in a vulnerable area (the occipital region of his skull on the back of his head) with a firearm. Perkins delivered the blow while White was defenseless with his back turned to Perkins. White was knocked to the ground and rendered unconscious. His "right eye [was] swollen shut" with "slightly blurry" vision and a "small laceration on [the] eye lid," his "upper and bottom lip[s] [were] swollen," and he had a "small laceration by [his] right ear lobe." Def.'s Ex. 1, at 3 (Jan. 29, 2015). He also complained of "facial pain, eye pain, [a] tooth feeling loose and not fitting together normally for him," and "pain on [the] right side of [his] head." *Id.* at 2-3.

What was true in *Burkeen* is true here. Given the circumstances of Perkins's attack on White, the trial court's inference that Perkins acted with a malicious intent to maim, disfigure, disable, or kill cannot be considered arbitrary or unreasonable.[5] Under our standard of review, a

---

[4] While we also relied on Burkeen's taunting and cursing of the victim *after* the blow to infer intent, *see Burkeen*, 286 Va. at 261, 749 S.E.2d at 175 — circumstances that do not exist in this case — we never suggested that those unique circumstances were a prerequisite for a rational factfinder to infer a malicious intent to maim, disfigure, disable, or kill.

[5] The Court of Appeals found that the trial court could not infer malice because White "was also struck by Williams and fell to the ground when he was rendered unconscious." *Perkins*, 2017 Va. App. LEXIS 10, at *14. We fail to see how this observation, if true, exonerates Perkins. Intending to rob White, Perkins and Williams were engaged in a concert of action. *See, e.g.*, Trial Tr. at 63 (stating that Williams "continually" told the detective that Perkins "set[] up the robbery," which is "where the money came from," and that he "got a hundred dollars for his role" in the crime); Commonwealth's Ex. 1a (depicting Williams and Perkins posing with a spread of money in similar denominations to those stolen from White, in which White identified Perkins as the man "that hit me with the gun and robbed me" and Williams as "the other guy that hit me and help[ed] Mooney rob me" (altering capitalization)). Given these facts, it does not matter whose blow caused which specific injury or, for that matter, which blows, singularly or collectively, caused White to lose consciousness. *See Thomas v. Commonwealth*, 279 Va. 131, 156-57, 688 S.E.2d 220, 234 (2010) (recognizing that lack of intent is not a defense to a conviction as a principal in the second degree "when there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act" (citation omitted)); 7 Bacigal, *supra*, at 513 ("[T]he concert of action principle is that one who has participated in bringing about a crime is criminally liable for unintended but incidental and probable consequences resulting from that crime."); John L. Costello, Virginia Criminal Law and

9

"factfinder may 'draw reasonable inferences from basic facts to ultimate facts,'" and those inferences cannot be upended on appeal unless we deem them "so attenuated that they 'push "into the realm of *non sequitur*."'" *Bowman*, 290 Va. at 500, 777 S.E.2d at 857 (citations omitted). The trial court's inference in this case falls securely within the "bell-shaped curve of reasonability." *Du v. Commonwealth*, 292 Va. 555, 564, 790 S.E.2d 493, 499 (2016) (citation omitted).

III.

In sum, the Court of Appeals erred in holding that no rational factfinder could infer that Perkins attacked White with a malicious intent to maim, disfigure, disable, or kill him. Violently striking an unsuspecting, defenseless victim, without provocation, in the back of the head with a firearm — with or without the combined violence of another acting in concert of action — supports the reasonable inference that the attacker had the intent to maliciously wound the victim in cases where, as here, the attack actually injured the victim.

We thus reverse and vacate, in part, the judgment of the Court of Appeals with respect to Perkins's convictions for malicious wounding and use of a firearm during the commission of a malicious wounding, and we correspondingly enter final judgment reinstating those two convictions.

This order shall be published in the Virginia Reports and certified to the Court of Appeals of Virginia and the Circuit Court of the City of Newport News.

A Copy,

Teste:

*Patr L Harrington*

Patricia L. Harrington, Clerk

---

Procedure § 17.2[4], at 270 (4th ed. 2008) ("One who engages in concerted action becomes criminally responsible for the immediate act for which he has 'contracted' and for all other crimes which are 'incidental, probable consequences' of the basic act." (citation omitted)).

10