PRESENT: Goodwyn, C.J., Powell, Kelsey, McCullough, Chafin, and Mann, JJ., and Lemons, S.J.

CATHERINE ANN TOMLIN

v. Record No. 220223

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
JUNE 29, 2023

FROM THE COURT OF APPEALS OF VIRGINIA

Catherine Ann Tomlin left her 80-year-old mother in a squalid condition lying on the floor of her apartment for at least two days, resulting in her mother's need for emergency medical care and hospitalization. The trial court convicted Tomlin of abuse or neglect of an incapacitated adult causing serious injury in violation of Code § 18.2-369(B). The Court of Appeals affirmed the conviction, as do we.

I.

"When presented with a sufficiency-of-the-evidence challenge in criminal cases, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. ___, ___, 884 S.E.2d 81, 88 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (citations omitted).

On April 24, 2020, an exterminator called 911 after he arrived at the Tomlin home to treat a bed-bug infestation and saw that Betty Tomlin, the defendant's mother, needed urgent medical attention. He told the dispatcher that she was "in pretty bad shape" and was "being eat[en] up with bed bugs." Def.'s Ex. A at 0:25 to 0:40.

First responder and firefighter Andy Tanner arrived shortly thereafter with another firefighter, and they entered the home where they found Betty lying on the floor just inside the door. Tomlin was standing nearby in the kitchen. Betty was "on her left side covered in feces and urine" with "what looked to be bed bugs crawling on her." J.A. at 32. She had visible bug bites on her legs, and there was excrement on her nightgown and the floor nearby. *Id.* Tanner asked Tomlin how long her mother had been lying there, and she said, "about two days." *Id.* at 34. When Tanner asked Tomlin why she hadn't cleaned her mother up, she said, "I do not have time." *Id.* After removing her clothing and Depends, which were "well over saturated" with "urine and feces," the firefighters wrapped her in a sheet and transferred her to the ambulance. *Id.* at 32, 34.

At the emergency room, Physician Assistant Tyler Prewett treated Betty. When she came into the emergency room, she was "highly disheveled" and had "a very uncommonly large amount of feces on her, [as] well [as] urine." *Id.* at 47. She was wrapped in a bed sheet, and "there [were] bed bugs about her person that fell to the floor." *Id.* Prewett observed that Betty had multiple decubitus ulcers, or bedsores, on her legs and below her buttocks. Based on her condition, he believed that Betty needed medical care "immediately." *Id.* at 67.

At trial, Prewett explained that a bedsore is dangerous because it is an "open sore[] on the body" or "skin breakdown" to the point of the skin being "actually broken open." *Id.* at 50. Such ulcers are "generally often quite painful" and create "a huge nest for bacteria which can lead to concomitant or super infection" from which "you can get a skin infection called cellulitis." *Id.* Cellulitis "can be deadly if not treated fairly rapidly." *Id.* A bedsore is more concerning than a cut, Prewett explained, because the "possibility for infection to enter is greater," as the wound is "much wider" and the "skin breakdown is larger" than with a cut. *Id.* at 68. Cellulitis is the "primary way" a bedsore can "become fatal." *Id.* at 51.

2

Prewett clarified that he is "not [a] wound specialist[]," *id.* at 48, and without using the "official grading system by a wound care specialist," *id.* at 54, he would generally describe most of Betty's wounds as moderate ulcers. But some of these ulcers were "not anywhere near as serious as the others." *Id.* at 76. One or more of the more severe ulcers, Prewett said, was "*at least* a moderate grade" of ulcer. *Id.* at 58 (emphasis added). He made a "conservative" estimate that Betty's wounds had taken at least one week "at a minimum" to develop. *Id.* at 50. The more severe ulcers would have taken longer than a week to develop and had more likely been "present for at least three weeks." *Id.* at 75.

Prewett described two of the ulcers as particularly "worrisome, from a medical perspective," because they were "of a bigger depth." *Id.* at 58. These ulcers had "broken the dermis and [were] approaching the fascia," which is "the fat underneath the skin tissue." *Id.* This is an indication of "*at least* a moderate grade ulcer" and "not a superficial ulcer." *Id.* (emphasis added). Another ulcer he described as smaller in size but similar in depth. This ulcer was also "concerning" because of the redness around it. *Id.* at 58-59. The redness was potentially an indication of "early cellulitis, which means an infection of the skin." *Id.* This wound was "certainly an advancing ulcer, if not skin infection." *Id.* at 59.

While Prewett did not believe Betty was at risk of "imminent death," *id.* at 66, he did believe that death was a risk if she did not receive proper medical care. During cross-examination, Prewett clarified his position:

> Q. Okay. You didn't feel a need to report to anyone that we really need to get on this right now because she might die?
>
> A. We need to get on this because if this was to go untreated . . .
>
> Q. We need to address these moderate ulcers because she might die.
>
> A. Correct.
>
> Q. You did not say anything like that and that was not the case?

A. Oh no, I do believe those ulcers would need to be, if proper medical care was administered that would need to be started immediately, proper medical care.

*Id.* at 67. Counsel then attempted to cabin Prewett's answer by asking, "Would you think the same if she actually had just cut her finger a little bit because of a splinter? Infection can certainly come in and that could also kill her, right?" *Id.* at 67-68. Prewett disagreed: "Most cuts, technically no. I'd be more concerned about this ulcer than I would be for a cut." *Id.* at 68. The "difference between a cut and the ulcer," Prewett opined, is that ulcers have a higher risk of infection than cuts. *Id.*

Betty's condition was worsened, Prewett added, because of the "amount of stool and urine that she was covered in, essentially from head to toe." *Id.* at 60. It was "stuck to her body," *id.*, and covered approximately "50% of [the] surface area" of her skin, *id.* at 69. Prewett explained that the "feces and urine [had gone] a long way to exacerbate" the condition of Betty's ulcers. *See id.* at 79. Prewett also expressed concern with Betty's apparent unawareness of her condition. Anyone who has reached that level of confusion could have suffered from "an infection that has caused her brain to not think correctly or a stroke," among other conditions. *Id.* at 61. Because Betty's bedsores needed treatment and could not "go on in the condition [they were] in," Prewett recommended that Betty be admitted to the hospital. *Id.* at 72.

The Commonwealth charged Tomlin under Code § 18.2-369(B) with abuse or neglect of an incapacitated adult resulting in serious bodily injury.[1] At a one-day bench trial, the court heard testimony from the first responder, the physician assistant, and the social worker who had investigated numerous complaints regarding Tomlin leading up to Betty's hospitalization. The

---

[1] Tomlin was also charged with and convicted of financial exploitation of an incapacitated adult under Code § 18.2-178.1. The Court of Appeals vacated the conviction on this count. Only the decision to affirm the neglect conviction is before us on appeal, so we have limited our discussion accordingly.

4

trial court also heard the exterminator's 911 call, saw photographs of Betty's wounds, and watched portions of a video of Tomlin's interview with social services. Tomlin herself also testified.

Tomlin moved to strike the evidence at the conclusion of the Commonwealth's case, arguing, among other things, that the Commonwealth had not proven that Betty suffered from a serious bodily injury as defined under the statute. Code § 18.2-369(C) provides, "'Serious bodily injury or disease' shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, or (vi) life-threatening internal injuries or conditions, whether or not caused by trauma."[2] Tomlin's counsel argued that the statutory definition contained an exclusive list of examples that did not include any mention of ulcers:

> [W]e even have a definition of serious bodily injury . . . [s]hall include but not be limited to disfigurement, fracture, severe burn or laceration, mutilation, maiming, life threatening internal injuries or conditions. They don't have moderate ulcers here. So I think the Commonwealth is not going to succeed on that element either.

J.A. at 106-07. In response, the prosecutor challenged counsel's characterization of Prewett's testimony regarding the severity of the ulcers. The prosecutor also disagreed with counsel's assertion that the statutory definition contained an exclusive list of examples. The "includes but not limited to" phrase, the prosecutor argued, directly refuted this assertion. *Id.* at 109.

The trial court denied the motion to strike and, at the end of the trial, found Tomlin guilty of the abuse or neglect of an incapacitated adult causing serious injury. The court concluded that Prewett's testimony and the photographs of Betty's wounds had sufficiently demonstrated that

---

[2] Throughout this opinion, we have referenced Code § 18.2-369 as it was at the time of Tomlin's conviction in March 2021. The General Assembly recently amended Code § 18.2-369. *See* 2022 Acts chs. 259, 642. The definition of "serious bodily injury" under Subsection C now reads: "'Serious bodily injury or disease' includes but is not limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, or (vi) life-threatening internal injuries or conditions, whether or not caused by trauma."

her injuries met the statutory definition of a serious bodily injury. Betty's injuries were "horrible," the court found, noting that "the pictures may make it clearer to see." *Id.* at 113. The court also rejected Tomlin's interpretation of Prewett's testimony. His testimony fully supported, the court stated, the conclusion that Betty had suffered "serious injuries that could lead to death" and needed immediate "medical attention." *Id.* at 154-55.

Tomlin appealed, and the Court of Appeals affirmed. It held that Tomlin's proposed definition of "serious bodily injury" was too narrow because an injury does not need to "threaten near-certain death to be sufficiently serious" nor be incapable of recovery with proper treatment. *Tomlin v. Commonwealth*, 74 Va. App. 392, 405 (2022). The Court of Appeals concluded that the totality of the evidence was sufficient to support the trial court's finding of a serious bodily injury.

## II.

On appeal to us, Tomlin argues that the Court of Appeals erred when it affirmed the conviction for abuse or neglect of an incapacitated adult because no rational factfinder could conclude that Betty's bedsores constituted "serious bodily injury" under Code § 18.2-369(B)-(C). We disagree.

### A.

The judgment of the trial court, sitting without a jury, is "entitled to the same weight as a jury verdict." *Cole v. Commonwealth*, 294 Va. 342, 361 (2017) (citation omitted). And for good reason — in a bench trial, a "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Perkins*, 295 Va. at 327 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). In both bench and jury trials, "we review factfinding with the highest degree of appellate deference." *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015).

6

When considering the evidence in the light most favorable to the Commonwealth, *supra* at 1, "[a]n appellate court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."" *Barney*, 302 Va. at ___, 884 S.E.2d at 89 (citations omitted). "[I]t is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929). The only "relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010).

The nature of appellate review requires that "we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient." *Barney*, 302 Va. at ___, 884 S.E.2d at 89. When the evidence is "considered as a whole," *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979), it may well be that "no single piece of evidence may be sufficient" to justify the conviction, *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (citation omitted). Even so, "the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Id.* (citation omitted). "Relying on this commonsense observation, we have often 'emphasized the importance of this totality-of-the-evidence analysis.'" *Barney*, 302 Va. at ___, 884 S.E.2d at 89 (citation omitted).

B.

Sitting as factfinder, the trial court found Tomlin guilty of Code § 18.2-369, which prohibits the "[a]buse and neglect of incapacitated adults."[3] First enacted in 1992, the statute

_____

[3] *See supra* note 2. Code § 18.2-369 is now entitled "[a]buse and neglect of vulnerable adults."

7

makes it "unlawful for any responsible person to abuse or neglect any incapacitated adult." Code § 18.2-369(A); *see* 1992 Acts ch. 551, at 705. Abuse or neglect that "results in serious bodily injury or disease" qualifies as a felony offense. Code § 18.2-369(B). Tomlin does not contest on appeal the trial court's finding that she abused and neglected her mother. Instead, Tomlin claims that a rational factfinder could not find beyond a reasonable doubt that her mother suffered any serious bodily injury as a result.

1.

On appeal, Tomlin organizes her legal argument around three canons of statutory construction. The first repeats the contention that Tomlin made in the trial court: Code § 18.2-369(C) provides an exhaustive list of serious injuries and diseases, and neither a bedsore (no matter its severity) nor anything "substantially similar" is on the list. Appellant's Br. at 10. This conclusion follows from the "rule of ejusdem generis," Tomlin contends, which treats "the specific examples as narrowing the general phrase, not as expanding the phrase to its 'widest extent.'" *Id.* at 9 (citation omitted). We recognize this doctrine in Virginia but find fault with Tomlin's application of it in this case.

Properly applied, the rule of ejusdem generis suggests that "when a particular class of persons or things is enumerated in a statute and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words." *Norton v. Board of Supervisors of Fairfax Cnty.*, 299 Va. 749, 759 (2021) (quoting *Martin v. Commonwealth*, 224 Va. 298, 301-02 (1982)). In this way, "[t]he effect of general words *when they follow* particular words [is] thus restricted." *Rockingham Co-op. Farm Bureau v. City of Harrisonburg*, 171 Va. 339, 344 (1938) (emphasis added).[4]

---

[4] *See also Kappa Sigma Fraternity, Inc. v. Kappa Sigma Fraternity*, 266 Va. 455, 470 (2003); *Turner v. Reed*, 258 Va. 406, 410 (1999); *Wood ex rel. Wood v. Henry Cnty. Pub. Sch.*,

The rule of ejusdem generis helps explain statutes that list a series of words or phrases in a specific-to-general sequence, such as "This Act applies to Toyotas, Fords, Hondas, Nissans, and other vehicles." The "other vehicles" catch-all would only catch motor vehicles (like Chevrolet autos and trucks) but not golf carts, snowmobiles, or helicopters. *See generally* Henry Campbell Black, Construction and Interpretation of the Laws § 71, at 203-07 (2d ed. 1911) (listing examples). In natural conversation as well as legal writing, the linguistic range of the last, broad entry generally should not be understood as outside the categorical range of the preceding series of specific entries. The linear order of the objects listed — that is, the "when they follow" sequencing, *Rockingham Co-op. Farm Bureau*, 171 Va. at 344 — is what makes the ejusdem generis rule sensible. The great weight of authority, both in Virginia and elsewhere, recognizes "that the specific-general sequence is required, and that the rule does not apply to a general-specific sequence." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 203 (2012).[5]

Tomlin's argument inverts the sequencing requirement of the rule of ejusdem generis. Code § 18.2-369(C) states: "'Serious bodily injury or disease' shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, or

---

255 Va. 85, 94-95 (1998); *Cape Henry Towers, Inc. v. National Gypsum Co.*, 229 Va. 596, 603 (1985); *East Coast Freight Lines v. City of Richmond*, 194 Va. 517, 525 (1953); *Standard Ice Co. v. Lynchburg Diamond Ice Factory*, 129 Va. 521, 532 (1921); *Stephen Putney Shoe Co. v. Richmond, Fredericksburg & Potomac R.R.*, 116 Va. 211, 220 (1914); *Button v. State Corp. Comm'n of Va.*, 105 Va. 634, 640-42 (1906); *Gates & Son Co. v. City of Richmond*, 103 Va. 702, 705-06 (1905); *American Manganese Co. v. Virginia Manganese Co.*, 91 Va. 272, 280-81 (1895); *City of Lynchburg v. Norfolk & W. R.R.*, 80 Va. 237, 249 (1885).

[5] *See generally Button*, 105 Va. at 640-42 (citing Black, *supra*, § 71, at 203; G.A. Endlich, A Commentary on the Interpretation of Statutes § 405, at 567-68 (1888)); *American Manganese Co.*, 91 Va. at 280-81 (citing Herbert Broom, A Selection of Legal Maxims 650 (8th Am. ed. 1882); Theodore Sedgwick & John Norton Pomeroy, A Treatise on the Rules which Govern the Interpretation and Construction of Statutory and Constitutional Law 361 (2d ed. 1874)); *City of Lynchburg*, 80 Va. at 249 (citing Sir Fortunatus Dwarris & Platt Potter, A General Treatise on Statutes 236 (1885)).

(vi) life-threatening internal injuries or conditions, whether or not caused by trauma." The general concept ("serious bodily injury or disease") precedes the specific examples. And to further avoid any misinterpretation, the general concept is followed by a phrase ("include but not be limited to") that doubles down on the inapplicability of ejusdem generis to the list of specific, illustrative examples. The "doctrine of ejusdem generis is inapplicable" when the illustrative list is qualified by the phrase "including, but not limited to." *Cooper Distrib. Co. v. Amana Refrig., Inc.*, 63 F.3d 262, 280 (3d Cir. 1995). To be sure, this common locution serves a "belt-and-suspenders function" to ensure that the enumerated specifics are not interpreted to limit the general. Scalia & Garner, *supra*, at 204-05.

Tomlin next turns to the maxim noscitur a sociis, but it too has no relevance to our interpretative task. Correctly viewed, the maxim noscitur a sociis means only that "when general and specific words are grouped, the general words are *limited by* the specific and will be construed to embrace only objects *similar in nature* to those things identified by the specific words." *Sainani v. Belmont Glen Homeowners Ass'n*, 297 Va. 714, 724 (2019) (emphases added) (citation omitted); s*ee also Loch Levan Land Ltd. P'ship v. Board of Supervisors of Henrico Cnty.*, 297 Va. 674, 685 (2019). That "limited by" principle, however, does not apply when the general words in a statute are expressly said to *not be limited by* the specific words. Phrases like "including but not limited to" and "including without limitation" are specifically "intended to defeat the negative-implication canon." Scalia & Garner, *supra*, at 132-33. These "cautious phrases" are used in drafting "to defeat three canons of construction: inclusio unius est exclusio alterius ('to express one thing is to exclude the other'), noscitur a sociis ('it is known by

its associates'), and ejusdem generis ('of the same class or nature')."  Bryan A. Garner, A

Dictionary of Modern Legal Usage 432 (2d ed. 1995).[6]

Neither the rule of ejusdem generis nor the maxim noscitur a sociis supports an

interpretation of Code § 18.2-369(C) that categorically excludes bedsores (no matter how

serious) from the list of injuries covered by the statute.  We similarly reject any interpretation

that excludes bedsores (when they are fairly characterized as serious injuries) from the reach of

Code § 18.2-369(C) on the ground that they are not anatomically similar to disfigurements,

fractures, burns, lacerations, mutilations, maiming injuries, or life-threatening internal injuries.

As the "include but not be limited to" phrase makes clear, the statutory list is neither exhaustive

nor is it a series of similitudes limiting the linguistic range of the phrase "serious bodily injury or

disease."

Finally, Tomlin argues that the Court of Appeals erred by not construing the definition of

"serious bodily injury" in Code § 18.2-369 to mirror its definition in a different statute, Code

§ 16.1-283(E).  The Court of Appeals was obliged to do so, Tomlin reasons, because the canon

of in pari materia dictates that these statutes "should be construed together."  Appellant's Br. at

11.  This maxim is generally true but inapplicable here.

Code § 16.1-283 addresses judicial orders terminating residual parental rights.  Various

factual scenarios must be considered before a parent can lose his or her legal rights to a child.

One is whether the parent has been convicted of felony assault resulting in a "serious bodily

injury."  Code § 16.1-283(E).  The statute states that "[a]s used in this section" the term "'serious

---

[6] Many courts have come to exactly this conclusion.  *See, e.g.*, *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 943-44 (9th Cir. 2012); *United States v. West*, 671 F.3d 1195, 1200-01 (10th Cir. 2012); *United States v. Migi*, 329 F.3d 1085, 1089 (9th Cir. 2003); *Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198, 1202-03 (6th Cir. 1996); *Cooper Distrib. Co.*, 63 F.3d at 280; *Lyman v. Town of Bow Mar*, 533 P.2d 1129, 1133 (Colo. 1975); *In re Forfeiture of $5,264*, 439 N.W.2d 246, 251 n.7 (Mich. 1989); *Yager v. State*, 362 P.3d 777, 783-84 (Wyo. 2015).

bodily injury' *means* bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Id.* (emphasis added). Harmonizing these definitions of "serious bodily injury," Tomlin argues, requires that a serious bodily injury under Code § 18.2-369 must necessarily be one posing a substantial risk of death.

This argument, like Tomlin's earlier ones, overlooks the "include but not be limited to" phrase that appears in Code § 18.2-369(C) but does not appear in Code § 16.1-283(E), and conversely, it takes no account of the "means" verb in Code § 16.1-283(E) that does not appear in Code § 18.2-369(C). These differences wholly change what is being said in each statute. "[W]hen an interpretation clause states that a word or phrase 'means . . . ,' any other meaning is excluded, whereas the word 'includes' indicates an extension of the ordinary meaning which continues to apply in appropriate cases." Rupert Cross, Statutory Interpretation 103 (1976). Thus, a statute stating that some genus term *means* X, Y, or Z provides an exhaustive list of subordinate meanings because a statutory "definition which declares what a term 'means' usually excludes any meaning not stated." 2A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 47:7, at 310-12 (7th ed. rev. April 2014). In contrast, a different statute defining the same genus term to *include but not be limited to* X, Y, or Z merely provides a non-exhaustive, illustrative list of meanings.

The error of Tomlin's argument highlights an even greater problem for her interpretation. By our count, there are more than 50 statutory provisions in the Code of Virginia using the phrase "serious bodily injury" or "serious injury" in a host of different contexts. Many of these statutes give no definition at all.[7] Some, like Code § 16.1-283(E), use the verb "means" in a

_____

[7] *See, e.g.*, Code §§ 4.1-225(1)(q) (grounds for which liquor licenses might be suspended or revoked), 8.01-225(A)(1) (exemption from liability for persons rendering emergency care),

12

manner that appears to give an exhaustive definition.[8]  One uses the verb "includes" before

introducing a list of examples.  *See* Code § 22.1-289.032.  Because of these textual

dissimilarities, we decline Tomlin's invitation to cull through the dozens of other statutory

provisions in the Code of Virginia to find a singular, comprehensive definition of "serious bodily

injury" to apply to Code § 18.2-369(C).

In short, Code § 18.2-369(C), which governs abuse and neglect of incapacitated persons,

like its companion statute, Code § 18.2-371.1(A), which governs abuse and neglect of children,

stands alone in its use of the included-but-not-limited-to phrase as a "belt-and-suspenders" effort,

*see* Scalia & Garner, *supra*, at 204, to emphasize the nonexclusive nature of the listed examples.

We will not limit its textual reach by excising from the statute this important syntactic clue to its

meaning.

2.

Having rejected Tomlin's proffered canons of construction, we must explain how we will

interpret Code § 18.2-369(C).  The answer is hardly startling.  We interpret plain, ordinary words

in a plain and ordinary way — hence "the plain meaning rule," *Supinger v. Stakes*, 255 Va. 198,

---

10.1-1455(A) (enforcement of the Virginia Waste Management Act), 16.1-269.1(A)(4)(e) (factors for determining whether a juvenile should be transferred from juvenile court), 18.2-52.1(D) (defining an infectious biological substance), 18.2-60(A)(3) (threats to do serious bodily injury), 29.1-740 (penalties for failing to stop and render assistance after a collision), 52-48(D) (penalties for disseminating confidential information).

[8] *See, e.g.*, Code §§ 3.2-6570(F) (cruelty to animals), 16.1-251(A)(2) (emergency removal orders), 18.2-51.4(E) (maiming resulting from driving while intoxicated), 18.2-58(A) (aggravated robbery), 63.2-910.2(B) (petitions to terminate parental rights).

Black's Law Dictionary, for example, references the definition of "serious bodily injury" used in the Model Penal Code to govern offenses involving danger to the person.  *See* Black's Law Dictionary 940 (11th ed. 2019).  Section 210.0(3) of the Model Penal Code provides: "'[S]erious bodily injury' *means* bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  (Emphasis added).

206 (1998).  The expression "serious bodily injury" is not a term of art borrowed from the lexicon of medical terms.  One will search in vain for a definition of "serious bodily injury" or "serious injury" in any of the recognized medical dictionaries.  *See, e.g.*, Mosby's Medical Dictionary (10th ed. 2017); Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary (1987 & 1992 Supp.); Stedman's Medical Dictionary (28th ed. 2006); Taber's Cyclopedic Medical Dictionary (23d ed. 2017).  It would make no sense to treat this phrase as a technical term of art that must be understood "according to the acceptation of the learned in [the pertinent] art, trade, and science," 1 William Blackstone, Commentaries *60, when the specialized discipline implicated here (the medical profession) does not do so.

To discover the plain and ordinary meaning of everyday language, we consult general-purpose dictionaries.  One of the most popular defines "serious" to mean "having important or dangerous *possible* consequences" as in "a serious injury."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/serious (last visited May 24, 2023) (emphasis added).  Another reputable dictionary defines "serious" as "attended with danger" and "giving cause for anxiety," as in a "serious illness" or "condition."  15 The Oxford English Dictionary 15-16 (2d ed. 1989).  And yet another states that "serious" means "to cause considerable distress, anxiety, or inconvenience:  attended with danger" as in "a [serious] injury."  Webster's Third New International Dictionary 2073 (2002).

When a statute uses the term "serious" but does not define it, both we and the Court of Appeals employ these common-sense meanings.  We have held, for example, that a "serious" violation of a motor vehicle law means a violation that is "[n]ot trifling; grave; giving rise to apprehension; attended with danger."  *Commonwealth ex rel. Lamb v. Hill*, 196 Va. 18, 23 (1954) (citation omitted).  A "serious bodily injury" constitutes a violation of a protective order,

14

the Court of Appeals has held, if the injury meets the *Hill* standard or otherwise gives "rise to

considerable care." *Nolen v. Commonwealth*, 53 Va. App. 593, 599 (2009).

We see the value of applying these common-sense considerations when determining

whether a "rational trier of fact," *Sullivan*, 280 Va. at 676, could have found beyond a reasonable

doubt that Betty suffered a "serious bodily injury" under Code § 18.2-369(C).  Viewing the facts

of this case in the light most favorable to the Commonwealth, the record established that:

- An exterminator called 911 when he found Betty lying on the floor of her home "in pretty bad shape" and "being eat[en] up with bed bugs."  Def's Ex. A at 0:25 to 0:40.

- The first responders, two firefighters, found Betty lying on the floor — where she had been for two days — "covered in feces and urine" with "bed bugs crawling on her."  J.A. at 32.  The first responders worked to safely transport her to the hospital where she could receive emergency medical attention.

- The physician assistant at the emergency room observed multiple decubitus ulcers on Betty's legs and below her buttocks.  He concluded that they had taken at least one week "at a minimum" to develop and that the worst of them had likely been "present for at least three weeks." *Id.* at 50, 75.

- The most problematic ulcers were "of a bigger depth" and had "broken the dermis and [were] approaching the fascia." *Id.* at 58.  These bedsores were not "superficial ulcer[s]." *Id.*

- The "redness" around the worst ulcer was evidence of potential "early cellulitis, which means an infection of the skin." *Id.* at 59.  It was "certainly an advancing ulcer, if not skin infection." *Id.*

- Cellulitis is the "primary way" a bedsore can "become fatal." *Id.* at 51.

- The risk of infection causing dangerous cellulitis was worsened because of the "amount of stool and urine that she was covered in, essentially from head to toe." *Id.* at 60, 79.

- The physician assistant concluded that proper medical care needed to begin immediately because Betty "might die" if her ulcers were left untreated. *Id.* at 67.  For this reason, the

physician assistant recommended that Betty be immediately
admitted into the hospital for further treatment and observation.

The trial court, sitting as factfinder, could have rationally determined that Tomlin's abuse and neglect of Betty caused her to suffer a "serious bodily injury" under Code § 18.2-369. The most advanced ulcer posed a fatal risk of infection for an 80-year-old woman who had been left on the floor in her own feces and urine for at least two days. The urgent need for institutional and costly medical care tangibly confirms this factual finding by the trial court. As the Court of Appeals fairly summarized the case:

> Although Tomlin argues the bed sores were treatable, [Betty] lay in her own filth for two days without any treatment or cleaning. Her condition was life-threatening because of the combination of bed sores, leg sores, and the increased risk of infection created by the ubiquitous bed bugs, feces, and urine covering her body.

*Tomlin*, 74 Va. App. at 408-09.

### III.

In sum, the trial court sitting as factfinder rationally concluded that the evidence proved beyond a reasonable doubt that Tomlin's abuse and neglect of her mother caused her mother to suffer a serious bodily injury under Code § 18.2-369. Agreeing with the Court of Appeals, we affirm Tomlin's conviction.

*Affirmed.*

16