COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys,[*] Huff and Athey
Argued at Virginia Beach, Virginia

LINWOOD SCOTT, JR.

                                                    MEMORANDUM OPINION[**] BY
v.        Record No. 1825-22-1                      JUDGE GLEN A. HUFF
                                                    MARCH 12, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Michelle J. Atkins, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Linwood Scott, Jr. ("appellant") of burglary, rape, and abduction with the

intent to defile.  On appeal, he challenges the sufficiency of the evidence, arguing that the DNA

evidence was unreliable.  For the following reasons, this Court affirms appellant's convictions.

---

    [*] Judge Humphreys participated in the hearing and decision of this case prior to the
effective date of his retirement on December 31, 2023.

    [**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

In May 2020, a grand jury indicted appellant for crimes committed in March 1994, to wit, burglary, rape, and abduction with the intent to defile. At the time of the offenses, the victim, M.S., lived in Norfolk with her husband George and their two-year-old daughter.[2] In the early morning hours of March 18, 1994, M.S. awoke to a man holding a butcher knife to her neck. Her daughter was asleep in another room, and George had not yet returned home from his overnight job. The assailant threatened to kill M.S. and her daughter "if she screamed or did anything." He then forced M.S. at knifepoint to walk into her daughter's bedroom, where he chastised M.S. for a broken windowpane that could allow someone to break into the home. The assailant "hovered" over the crib and implied "that if [M.S.] didn't cooperate, that he would kill both" her and her daughter. He then directed M.S. to the living room where he showed her that he had cut the telephone line. When M.S. said that her husband would be home "anytime," the assailant "got really nervous." He told M.S. to lay on her stomach and inserted his penis into her vagina. He then ordered M.S. to turn over onto her back and continued penetrating her vagina with his penis. Afterwards, the assailant walked M.S. back to her bedroom at knifepoint, "put [her] back in the bed," and placed a blanket over her before ordering her to count to 100. He said he "was going to be watching the house" and threatened to return and kill her and her daughter if M.S. called the police.

---

[1] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] This Court refers to the victim by her initials to preserve her privacy.

Once the assailant left, M.S. grabbed her daughter and ran to a neighbor's home to call the police. On the 911 call, M.S. described the assailant as a black male, 5'8" tall, and "chubby, with a deep voice and some white stuff on his face." At appellant's trial, M.S. testified that the "white stuff" had looked like "thick shaving cream" covering the assailant's face from "[his] eyes down through [his] chin past [his] mouth."

Later in the day on March 18, 1994, M.S. gave a recorded statement to Norfolk Police Investigator Hockman, in which she described the assailant as a black male, 5'8" to 5'9" tall, over 200 pounds, and 19 to 26 years old. She also told Investigator Hockman that the assailant had a "pot belly" and "stretch marks." At trial, M.S. testified that she had described the assailant as being 5'8" to 5'9" tall because George was 5'6" and the assailant was "around" the same height as George or "maybe a little taller." She further explained that she had tried to "take mental notes" about the assailant's appearance as they walked through the house. Although nearly all the lights inside the residence were off, M.S. could clearly see the assailant in the light coming into the house from outside streetlights.

Immediately following M.S.'s report of the attack, Investigator Hockman transported M.S. to the hospital for a forensic examination. As part of that exam, the doctor collected a physical evidence recovery kit (PERK), which included swabs from M.S.'s "vaginal/cervical" region and her "thighs/external genitalia" area. Despite their efforts, the police were unable to identify a suspect, and the case remained on "inactive status" for over two decades.

In 2019, M.S. contacted the police after seeing a "news story about rape kits that were sitting untested." Detective Smith of the cold case unit located the 1994 case file and the physical evidence, including the PERK. In reviewing the evidence, Detective Smith "developed an investigative lead" that identified appellant as a suspect. As a result, M.S. was shown a photo

lineup that included appellant's picture. M.S. pointed out a picture that she "thought was very similar to the person" who raped her; it was not the picture of appellant.[3]

Detective Smith also interviewed appellant as part of his investigation. At trial, Detective Smith testified that appellant was 5'5" tall and 41 years old in March 1994. At the time of the interview in 2019, appellant weighed 130 pounds; the record does not reflect his weight in 1994. Appellant was initially "jovial" and "chatty" before Detective Smith informed him that the interview was connected to an unsolved rape case from 1994. When Detective Smith administered *Miranda*[4] warnings and questioned appellant about the details of this case, appellant's "demeanor changed" significantly. He "slumped over," his eyes teared, and he would not look at Detective Smith. When Detective Smith handed appellant a warrant authorizing Smith to obtain buccal swabs for appellant's DNA, appellant "ripped it up." Notwithstanding appellant's frustration, Detective Smith collected buccal swabs.

Detective Smith then submitted M.S.'s PERK along with buccal swabs from M.S., George, and appellant to the Department of Forensic Science (DFS) for analysis. Forensic biologist Anne Pollard conducted a first review of that evidence and later testified at appellant's trial as an expert in forensic biology. She explained that, after identifying spermatozoa on the swabs from M.S.'s forensic examination, she used polymerase chain reaction analysis to develop a DNA profile from the "vaginal/cervical" swabs. That profile included DNA from M.S., George, and a third contributor. "Due to the limited information obtained," however, the DNA from the third contributor was not suitable for comparison.

---

[3] The picture M.S. identified was taken in 1985. The picture of appellant used in the photo lineup—which M.S. did not select—was taken in 1984.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Pollard then developed a DNA mixture profile from a sperm fraction found on the "thighs/external genitalia" swab and compared it with the known DNA samples from George and appellant. She eliminated George as a contributor but was not qualified to perform the statistical analysis regarding appellant's status as a contributor. Therefore, Pollard sent the data from the DNA mixture profile as well as M.S.'s, George's, and appellant's DNA profiles to DFS biologist Lisa Schiermeier-Wood for additional analysis.

Schiermeier-Wood, who also testified at appellant's trial as an expert in forensic DNA analysis and statistics, used TrueAllele, a "computer-aided statistical interpretation program," to analyze the DNA profiles Pollard sent. Schiermeier-Wood explained that TrueAllele "will take a DNA mixture profile and essentially decode it or tease it apart into [its] component contributors." One of the factors the program considers in such analysis is the number of contributors to the DNA profile. Based on her training and experience, Schiermeier-Wood determined that the DNA profile from the sperm fraction of the "thighs/external genitalia" swabs "appeared to be a mixture of . . . two contributors." Thus, she "asked the [program] to decode the mixture as though it was made of two contributors."

The TrueAllele analysis concluded that appellant "could not be eliminated as a contributor to this DNA mixture profile." The program further concluded that "[a] match between the sperm fraction of [M.S.'s] thighs/external genitalia sample and" appellant was "3.7 sextillion times more probable than a coincidental match to an unrelated African American person, 16 septillion times more probable than a coincidental match to an unrelated Caucasian person, and 590 sextillion times more probable than a coincidental match to an unrelated Hispanic person." The trial court admitted the certificate of analysis containing these conclusions without objection at appellant's trial.

Schiermeier-Wood acknowledged on cross-examination that her assumption of two contributors to the DNA mixture profile "could substantially affect" the TrueAllele analysis. She

stated, however, that because there was a "very major contributor" to the DNA profile, she did not think that the presence of a third contributor "would have affected the results very much." Nevertheless, she also acknowledged that appellant and M.S. "share[d] some of the same DNA types."

At the close of the Commonwealth's case, appellant moved to strike the evidence. He asserted that there were "significant issues with the identification" M.S. made and that the DNA results were "the only other evidence" offered to establish him as the perpetrator. He further argued that the DNA "would not prove from the totality of the evidence" that he "was actually the assailant" and that the Commonwealth did not prove that his "actual DNA" contributed to the profile taken from the swabs of M.S.'s thighs and external genitalia. The trial court overruled the motion, and the jury convicted appellant on all counts. This appeal followed.

ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by

the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Appellant argues that the Commonwealth failed to prove beyond a reasonable doubt that he was the assailant who broke into M.S.'s residence and abducted and raped her. He primarily asserts that "[t]he accuracy of the conclusion drawn" by TrueAllele "is dubious at best." The accuracy, he contends, was "circumscribed" by degradation of the samples, the fact that appellant and M.S. share "multiple common DNA types," and the fact that Schiermeier-Wood "designated the analyzed DNA mixture profile as being comprised of DNA from only two contributors." Appellant, therefore, argues that "the limited DNA evidence under all the circumstances was insufficient to overcome the presumption of innocence." Moreover, he claims that M.S.'s "multiple prior descriptions of the attacker totally exclude" him "as the criminal agent."

Under the applicable standard of review, this Court rejects appellant's contention that the accuracy of the DNA results was "dubious at best." In assessing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the Commonwealth. So viewed, the DNA results established that appellant's DNA was present on the swabs of M.S.'s thighs and external genitalia. He offered no innocent explanation at trial for the presence of his DNA on M.S.'s thighs and external genitalia. Further, appellant does not contest that a rational jury could convict him of the charged offenses if it credited the results of the DNA tests.[5]

This Court further rejects appellant's contention that M.S.'s descriptions of the assailant "totally exclude[d]" appellant as the perpetrator. Appellant claims that M.S. "had ample opportunity to observe his physical characteristics, and while the traumatic events may have

_____

[5] Appellant does not challenge the admissibility of the DNA results. Thus, the jury had the authority to determine its weight. *See Wells v. Commonwealth*, 65 Va. App. 722, 728 (2016).

altered her perception, it is improbable that she would misperceive his height, weight, and age by such wide margins." But the jury, "who ha[d] the opportunity to see and hear the witnesses, ha[d] the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)). Accordingly, it was within the province of the jury to determine M.S.'s opportunity to observe the assailant's physical characteristics as well as whether and to what extent she "misperceive[d]" those characteristics.[6]

Moreover, the jury must weigh the evidence "collectively," rather than in "isolation." *Hargrove v. Commonwealth*, 77 Va. App. 482, 507 (2023) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017). Here, that means considering the probative value of M.S.'s descriptions alongside the probative value of the DNA results and other inculpatory evidence. As noted above, the jury could reasonably infer from the DNA results that appellant's DNA was on M.S.'s thighs and external genitalia. And Detective Smith's testimony established that appellant's demeanor changed after learning that he was a suspect of this offense, leading to him ripping up a search warrant for his DNA. Viewing this evidence together in the light most favorable to the Commonwealth, this Court cannot say that no rational factfinder could conclude beyond a reasonable doubt that appellant was M.S.'s assailant in 1994.

CONCLUSION

For the reasons stated above, this Court affirms the trial court's judgment.

*Affirmed.*

---

[6] Although M.S. did not identify appellant in a photo lineup, the jury could consider that the photograph used was almost ten years out-of-date. The picture—which was not of appellant—that M.S. selected was taken in 1985 and appellant's line-up picture was taken in 1984; both approximately a decade before M.S. was attacked.