UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges O'Brien and Lorish

JOSHUA CARL GANNON VOLTZ

MEMORANDUM OPINION*

v.        Record No. 0845-22-3          PER CURIAM
                                         APRIL 4, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF STAUNTON
Anne F. Reed, Judge

(Samantha Offutt Thames, Senior Appellate Counsel; Virginia
Indigent Defense Commission, on brief), for appellant.

(Jason S. Miyares, Attorney General; John Beamer, Assistant
Attorney General, on brief), for appellee.

Joshua Carl Gannon Voltz challenges the length of the active sentence he received for

convictions of assault as a hate crime, assault of a law enforcement officer, and misdemeanor

assault and battery of a family member, in violation of Code §§ 18.2-57(B), (C), and -57.2. He

contends that the trial court erred by failing to give appropriate weight to his mitigation evidence.

We hold that the appeal is wholly without merit.[1] After a thorough review, we affirm the trial

court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413.

[1] After examining the briefs and record in this case, the panel unanimously agrees that because "the appeal is wholly without merit," oral argument is unnecessary. Therefore, we dispense with oral argument in accordance with Code § 17.1-403(ii)(a) and Rule 5A:27(a).

BACKGROUND[2]

The appellant pleaded guilty to assault as a hate crime, assault of a law enforcement officer, and misdemeanor assault and battery of a family member. Before accepting the appellant's guilty pleas, the trial court conducted a colloquy with him to ensure that he understood their implications. During the colloquy, the appellant acknowledged that he faced a total maximum sentence of ten years and twelve months of incarceration and a $7,500 fine. He assured the court that he had reviewed the sentencing guidelines with his attorney and understood that the trial court was not required to follow them. The court accepted the guilty pleas, finding that he made them "freely, intelligently, and voluntarily."

The Commonwealth proffered that on February 20, 2021, the appellant entered a convenience store and "locked eyes" with Josue Heriberto Navarro Aguirre, who was standing at a kiosk ordering food. The appellant approached Aguirre in "an aggressive manner," and they "exchanged words." A "heated" argument ensued, and the appellant yelled that "[a]ll you Mexicans should die." He also declared that "they all need to go back where they came from." As the two men approached each other, Aguirre's sister and another person grabbed Aguirre's arms and shoulder to prevent an escalation. While Aguirre was restrained, the appellant punched him in the face.

Staunton Police Department officers arrived at the convenience store in response to a report of a "fight in progress." When Officer R.A. Brady told the appellant he was being charged with a hate crime, he called Brady a racial slur.

---

[2] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires the appellate court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Three days after the attack, the appellant phoned his mother from jail.[3] During that recorded telephone call, he referred to Aguirre as a "Mexican," the store patrons as "Chicos," and Officer Brady as "some kind of Chico." The appellant admitted to his mother that he had called Aguirre a Mexican and told him to "go back to Mexico." The appellant expressed confidence that Aguirre would not want to "press charges" because he was "probably a fucking immigrant."

On July 31, 2021, Staunton police officers went to a residence that the appellant shared with Heather Kiser in response to a domestic disturbance call. Kiser told the officers that the appellant sat on her legs and grabbed the sides of her face to make her look at him. The officers noticed red marks on Kiser's face, consistent with her account. The appellant was arrested for domestic assault and battery and placed in Officer N.M. Fetty's patrol vehicle.

During transport to the jail, the appellant lit a cigarette in the patrol vehicle. Officer Fetty told him to extinguish the cigarette, and the appellant complied. When they arrived at the jail, however, he attempted to light another cigarette in the sally port. Officer Fetty told the appellant to give her the lighter, but he refused. The officer tried to take the lighter from the appellant, but he grabbed her wrist, "bent it backwards[,] and twisted it."

During recorded telephone calls between the appellant and Kiser, he tried to persuade Kiser to testify that her three-year-old child had caused her injuries. In the alternative, the appellant encouraged Kiser to testify that she could not remember what happened. He admitted that he "made" Officer Fetty "wrestle" a lighter out of his hand. During those calls, the appellant also said that he was a "documented white supremist" and his cellmate had "better be a white dude with tattoos."

---

[3] The recordings were not admitted into evidence. However, portions of the recordings were played during the sentencing hearing.

In a separate recorded telephone call between the appellant and his mother, he told her that he was going to "fly off the handle and f--k somebody up." The appellant said he had already assaulted "the woman [he] love[s], an officer, and a Mexican." He proclaimed he was never going to give up his white supremacist ideology because he was "supreme over all these people."

The trial court also admitted into evidence an expert report from a researcher with the Anti-Defamation League. The report explained the symbolism and significance of the appellant's many tattoos to those who espouse white supremacist ideologies.

The appellant stipulated that the Commonwealth's evidence was sufficient to convict him of all the charges, and the trial court found him guilty of the crimes.

At the sentencing hearing, the Commonwealth summarized the events underlying the offenses. In addition, the prosecutor played portions of the recorded jail telephone calls and read Aguirre's victim impact statement. Aguirre reported that he had missed more than a week of work because of his facial injuries. He also had been unable to visit his son because the child's mother feared for the child's safety. Aguirre never thought he would be targeted for "being Hispanic" but now feared for his own "safety and the safety of the people with [him]." The appellant's unprovoked attack had changed Aguirre's life and that of his family because it caused them to "question the safety of [their] home and [their] community."

The appellant's mother testified that he had been diagnosed with attention deficit hyperactivity disorder when he was seven years old and bipolar disorder when he was seventeen. When the family moved from Detroit to Florida, the appellant began using drugs and alcohol, committed petty crimes, and eventually served five years in prison. According to his mother, the appellant's mental health deteriorated while he was incarcerated. She described him as "easily agitated" and in a constant state of "heightened" anxiety. She felt that the Florida prison system

had released the appellant from his five-year confinement without providing structure such as probation or parole. In the mother's view, the appellant needed medication, drug treatment, therapy, and probation. According to her, the appellant never exhibited white supremacist ideologies until he was in prison, where he received his tattoos. She promised that, upon his release from prison, he would reside with her and she would provide transportation to therapy and probation. The appellant's father had secured a job interview for him.

The appellant testified that he was receiving treatment for his bipolar disorder and, since he began treatment, had no trouble, arguments, or altercations. According to the appellant, he did not receive treatment while in prison in Florida or upon his release. Since receiving treatment, the appellant had noticed a "significant change" in his mental state, and he planned to continue his mental health treatment upon his release from prison. Further, the appellant testified that he would cooperate with probation and participate in substance abuse treatment. He planned to live with his parents and had a job opportunity available.

On cross-examination, the appellant acknowledged that he had tattoos representing white supremacy, including four swastika tattoos. He claimed that his tattoos, which he received in prison, and their symbolism were "only a prison thing" and he was not an active member of a white supremacist group. The appellant admitted, however, that he told his mother that he was "never going to . . . just stop." He also admitted that he used gang terminology with Kiser's child.

The appellant contended that the incident at the convenience store was simply an argument between "two people who didn't like each other." He testified that he did not hold "anything against anybody because they're different" from him.

The discretionary sentencing guidelines recommended a sentencing range of one year and one month imprisonment to three years and five months. The midpoint was two years and three

months.  The recommendation was only for the convictions of the assault and battery of a family member and assault of a law enforcement officer.  The guidelines did not account for the appellant's hate crime conviction.

The Commonwealth asked the trial court to impose the midpoint of the sentencing guidelines for the two convictions they included.  The prosecutor urged the court to also impose an active sentence of five years of imprisonment for the hate crime conviction.  According to the Commonwealth, the seriousness of the hate crime and the appellant's "unremorseful behavior" warranted the maximum sentence of five years.  The prosecutor noted that the appellant committed his "unprovoked act" of racial "violence on a total stranger" only three weeks after he was released from prison.  In the prosecutor's view, the appellant was not a good candidate for rehabilitation because he had professed his continued commitment to his "hateful" views and repeated them to a child.  According to the prosecutor, the appellant exhibited "a pattern of violent behavior."  Given that pattern, the Commonwealth asked the trial court to impose a sentence that would protect the community and deter further acts of violence because "white supremacy has no place" in society.

The appellant asked the trial court to impose a more lenient sentence.  He reasoned that his previous incarceration had "made him the way he is."  The appellant stressed that the recorded jail telephone calls the Commonwealth played were made "over a year" earlier, before he began receiving treatment for his bipolar disorder.  He stressed that he currently received medication and it significantly improved his mental state.  The appellant emphasized his plan to become a productive member of society by continuing his medication, seeing a therapist, and working.

In allocution, the appellant apologized to the court, Aguirre, and Aguirre's family.  He expressed his remorse, noting that he thinks about his actions "every single day."

The trial court found that, without provocation, the appellant attacked Aguirre, who was "merely in the store with family to get something to eat." It determined that the appellant's actions caused "significant . . . harm" to the victim, his family, and the community. The court opined that community members should be able to "engag[e] in . . . normal acts of daily life without fear." After acknowledging the appellant's "mental health issues," the trial court found that it was the appellant's responsibility to ensure he was "in a state that [was] safe" for him and the community. The court concluded that the sentencing guidelines did not include the hate crime conviction because the "nature of the offense" required the court to "look at the specifics of the incident" and "the background of the offender before making an appropriate decision about [the] sentence." Ultimately, the court sentenced the appellant to five years for the hate crime, five years for the assault on a law enforcement officer, and an additional twelve months, to run concurrently, for the assault and battery of a family member. It suspended four years of that sentence, leaving six years of active time to serve.

ANALYSIS

The appellant raises a single issue on appeal. He challenges the length of the active term of incarceration the trial court imposed.

An appellate court reviews a trial court's sentencing decision under an abuse of discretion standard. *See Rawls v. Commonwealth*, 272 Va. 334, 351 (2006). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). A reviewing court can conclude that "an abuse of discretion has occurred" only when "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). A trial court

abuses its discretion by failing to consider a significant relevant factor, giving significant weight to an irrelevant or improper factor, committing a clear error of judgment, or making a mistake of law. *See Minh Duy Du*, 292 Va. at 564-65; *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013).

It is well-established that a "sentence will not be overturned as being an abuse of discretion" if it "prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum." *Minh Duy Du*, 292 Va. at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565).

Here, the appellant's sentence was within the ranges set by the legislature. *See* Code §§ 18.2-10, -11, -57, -57.2. He nevertheless contends that the trial court abused its discretion by failing to give "significant weight" to his mitigating evidence, including his mental illness, substance abuse, and the "brutality" he had suffered while in prison. He further argues that his mental health disorders and "prison indoctrinations" were the root cause of his unlawful behavior but he was "beginning down a road towards true recovery."

It was within the trial court's purview to weigh the mitigating evidence the appellant presented, including his mental illness, addictions, and the conditions he had endured during his prison incarceration. *See Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.*

The record reflects that the trial court specifically acknowledged the appellant's mitigating evidence, including his mental health issue. Indeed, the court advised the appellant that

it was "vital" for him to comply with his mental health treatment in the future. Balanced against the mitigating evidence, however, were the significant facts in aggravation. Most notable were his "troubling" criminal history and his unprovoked racially motivated attack on a wholly innocent victim. The trial court found that the guidelines did not "adequately reflect the serious nature of the charge and the danger to the community." After considering all the evidence, the court imposed the active sentence that it deemed appropriate. That sentence was within the ranges authorized by statute. *See* Code §§ 18.2-10, -11, -57, -57.2. For these reasons, the trial court exercised its discretion appropriately in sentencing the appellant. *See Thomason*, 69 Va. App. at 99.

## CONCLUSION

The trial court did not abuse its discretion in imposing the appellant's sentence. The court considered the evidence presented by the appellant in mitigation of his crimes, and the sentence was within the permitted statutory range. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*