COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Frucci and Bernhard
Argued at Fairfax, Virginia


JASON JOSUE CASTRO

MEMORANDUM OPINION[*] BY
v.        Record No. 1967-23-4         JUDGE STEVEN C. FRUCCI
                                       JUNE 3, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
James A. Willett, Judge

William D. Ashwell (Ashwell & Ashwell, PLLC, on brief), for
appellant.

Katherine Quinlan Adelfio, Senior Assistant Attorney General
(Jason S. Miyares, Attorney General, on brief), for appellee.


A Prince William County jury convicted Jason Josue Castro of object sexual penetration,

abduction, and strangulation, and it acquitted him of statutory burglary and attempted rape.

Castro contends that the circuit court erred in (1) refusing to set aside the verdict "as to object

sexual penetration" due to the lack of evidence and inconsistent verdicts returned by the jury; (2)

refusing to allow a SANE ("Sexual Assault Nurse Examiner") to answer certain questions about

the victim's sexual history; and (3) finding the evidence sufficient to support his convictions.

For the following reasons, this Court affirms the circuit court's judgment.[1]

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Castro raises issue with the circuit court's denial of his motion to set aside the verdict.
The circuit court orally denied this motion at a hearing held on June 7, 2023; however, in its July
18, 2023 order reflecting the rulings from that hearing, the circuit court stated it was denying a
"Motion for Date Certain Pending Motion to Set Aside Verdict" rather than the motion to set
aside.  As such, we remand the case back to the circuit court for the limited purpose of correcting
the clerical error in the order.  *See* Code § 8.01-428(B).

BACKGROUND[2]

While in high school, B.C.[3] started dating Castro. After some time, their relationship became "on again, off again." In September 2020, B.C. had recently graduated from high school and was living in a two-story house in Prince William County with her mother and one of her sisters. She stayed in the basement bedroom, and her mother and sister occupied the upstairs bedrooms. The basement bedroom had a bed and a side table, a door and a window, and a separate bathroom.

At around midnight on September 17, 2020, Castro called B.C. to discuss "a guy that was going around saying that [B.C.] slept with him." At the time, B.C. and Castro were "broken up," but Castro was "just very persistent about wanting" information. B.C. told Castro, as she had on a previous occasion, that she no longer wanted to date him. Castro "didn't like" what she was telling him and "wasn't okay with it," so he told her that if she hung up the phone he would come to her house. In the back of her mind, B.C. had "a really weird feeling," but she hung up the phone and went to bed.

Hours later, B.C. awoke to find Castro standing in her bedroom looking at her. At the time, no one else was in the home. Castro told her he just wanted to talk. B.C. was not afraid at first because she did not think he would hurt her, but he kept asking her if she was "sleeping around" and refused to leave. Castro got into bed with B.C. and continued to accost her with

---

[2] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] We use initials, rather than names, to protect the privacy of the victim.

questions about her sex life. When B.C. refused to answer his questions "properly," Castro became frustrated and held B.C. "up against the window" that was at the head of her bed while holding her neck with one hand, making it hard for her to breathe. His hand was in the middle of her neck "in the front toward [her] throat." B.C. unsuccessfully tried to push Castro off her and feared he would end her life. Eventually, Castro released B.C.

Following this interaction, B.C. went upstairs to shower, mostly because she wanted to get away from Castro and his questions. While upstairs, B.C. called Castro's sister, his mother, and a friend and told them that Castro would not leave. She did not call the police because Castro had just been released from jail and was "guilt tripping" her about "put[ting] him back when he just got out." After her shower, B.C. returned to the bedroom where Castro was sitting on the bed "just waiting" for her.

B.C. and Castro continued to argue and at one point Castro slapped her face twice with an open hand. He "threatened to shoot [her] on [her] foot and on [her] butt so that [she] wouldn't die, that [she] would just feel pain."[4] B.C. then found herself on the bed and Castro was on top of her. He touched her breasts over her clothing. He also pulled her pants down and put his fingers inside her vagina. He then unsuccessfully tried to penetrate her vagina with his penis. B.C. pushed him off her and begged him to stop. Then, Castro grabbed her arm and put his penis in her hand. While he did this, B.C. told him she "didn't want to do anything with him." Using her cell phone, B.C. recorded parts of the interaction.[5] At some point, B.C.'s mother returned

---

[4] While Castro threatened to do this, B.C. did not see a firearm.

[5] The recording was played in front of the jury and admitted into evidence at the trial. At one point, B.C. asked why Castro forced her to do "sexual stuff." Castro asked if his actions involved what she "usually" let him do, and B.C. replied that she "was literally begging [him] to stop."

home but B.C. did not yell out to her because she did not want to "escalate" the matter and because she was concerned that Castro might hurt her mother.

B.C. tried to leave the bedroom several times, but Castro stood in her way and would not let her out. Eventually, she freed herself from the bedroom, locked herself in the bathroom, and called one of her sisters for help. B.C.'s sister proceeded to call their other sister who was only "three minutes away" from the house at the time. The second sister then came to the house with her boyfriend, went down into the basement, and intervened. The sister's boyfriend and Castro fought, and B.C.'s mother came down into the basement and tried to separate the two men. Castro "bad-mouth[ed]" B.C.'s mother and sister and "then . . . ran away." Eventually, "someone" called the police and B.C. went to the hospital for an examination.

Prince William County Police Sergeant Brian McCleese investigated the case. B.C. told Sergeant McCleese about what happened, including that she had told Castro she did not want to be intimate, that Castro had kissed her and touched her breasts while she pushed him away, that he had removed her underwear and attempted to insert his penis into her vagina, and that he had aggressively inserted his fingers into her vagina. She also wrote a statement reporting that Castro begged her to talk to him, that he removed her pants and underwear, that he threatened to shoot her and said he wanted to beat and kill her, that he choked her, that he slapped her "a couple times," and that he "[p]ut his fingers inside of [her]." She also wrote that he would not let her out of the bedroom. Her written statement did not mention that Castro attempted to rape her, that she had kissed him, or that he had forced her to touch his penis, but she later explained that she wrote the statement soon after the offenses occurred when she "was trying to put it all together" and that she "didn't really know what to say when [she] was writing it" because "it was a lot."

- 4 -

At trial, before calling SANE Emily Cremeans to testify, the Commonwealth informed the circuit court that it had redacted the SANE report to omit questions and answers regarding when B.C. had last had consensual sexual intercourse. The Commonwealth moved the circuit court for a ruling disallowing Castro to comment on or question Cremeans about statements B.C. made concerning any prior consensual sexual intercourse unrelated to Castro that she may have engaged in. The Commonwealth argued that this information was not admissible because there had not been a pretrial rape shield hearing under Code § 18.2-67.7. Castro responded that if the Commonwealth intended to admit the SANE report, the entire unredacted document should be admitted in accordance with the "best evidence" rule and the "rule of completeness." Castro argued that he wanted to ask B.C. if the injuries referenced in the SANE report might have been inflicted during a prior sexual encounter rather than during this incident with Castro.

While the circuit court permitted the use of the redacted SANE report, the circuit court ruled that it would not restrict Castro's cross-examination on issues of "other causation" for B.C.'s injuries, but it took under advisement whether Castro could ask Cremeans about "taking a sexual history or asking her when the last time [B.C] had sexual intercourse was." The circuit court explained that "at this juncture" it was giving Castro leeway to "establish a path where [he] might be able to ask it."

After the circuit court qualified Cremeans as an expert in the area of forensic nursing, "a subcategory of which would be strangulation," Cremeans confirmed that she examined B.C. at the hospital on the day of the offenses. Cremeans testified that she did not always expect to see an injury in cases involving attempted penile penetration or digital penetration. Even so, during B.C.'s genital exam, Cremeans observed with her "naked eye" "some abrasions to [B.C.'s] labia minora and some possible bruising in an area that was tender to her hymen." Cremeans explained that she used the word "possible" because "you can't really tell if it's actual bruising

- 5 -

or if it's just redness, erythema." If bruising was present, it "would be caused by a blunt force kind of trauma," and the tenderness experienced by B.C. suggested that the redness was "more likely some sort of trauma."

As for the "non-genital exam," Cremeans defined strangulation as "any act or any force that restricts the blood flow and the air flow in the neck." She testified that strangulation does not always cause bruising to the neck, but B.C. had reported that she struggled to breathe when Castro strangled her and she had a "yellow, oblong . . . bruise with some overlaying abrasions, or scratches" on the left side of her neck and two bruises on the right side of her neck. Cremeans also observed six injuries to B.C.'s face, her cheek, her inner lip, and her chin and B.C. had an abrasion and two bruises on her chest and back.

With the circuit court's permission, Castro asked Cremeans if the injury to B.C.'s hymen could have been caused by sexual intercourse, and Cremeans responded, "yes." Cremeans could not determine when B.C. sustained the injuries to her labia minora and hymen or to any other part of her body, but she stated that B.C.'s hymen injury could have been caused by digital penetration. Castro did not ask or proffer any other questions about B.C.'s sexual contact with other, unnamed individuals.

After the Commonwealth rested, Castro did not move to strike the evidence or present evidence, and the jury later convicted him of strangulation, abduction, and object sexual penetration and acquitted him of attempted rape and burglary. Before sentencing, Castro moved to set aside the verdict, arguing that the jury's not-guilty verdict with respect to the attempted rape charge was inconsistent with its finding of guilt on the object sexual penetration charge. Castro argued that if the jury found B.C.'s testimony incredible with respect to the attempted rape, its finding that she was credible with respect to the object sexual penetration offense was impermissibly inconsistent and thus that the evidence was insufficient to support his conviction.

The circuit court rejected this argument finding both that the verdicts were "not inconsistent" and that Virginia law precluded the reversal of jury convictions when the jury rendered inconsistent verdicts. Following his sentencing hearing, Castro appealed.

ANALYSIS

I. The Motion to Set Aside the Verdict

Castro argues that his conviction for object sexual penetration is inconsistent with his acquittal on the attempted rape charge and thus that the evidence was insufficient to support his conviction for object sexual penetration. To support this claim, he argues that the two offenses occurred at "around the same time" and the jury's apparent rejection of B.C.'s testimony surrounding the attempted rape necessarily precluded it from accepting her testimony regarding the object sexual penetration.

Acquittals and convictions are only inconsistent when "the essential elements in the count wherein the accused is acquitted are *identical* and *necessary*" to prove the offense for which he is found guilty. *Akers v. Commonwealth*, 31 Va. App. 521, 528 n.3 (2000) (emphasis added). An accused is guilty of rape if he has "sexual intercourse with a complaining witness . . . against [her] will, by force, threat or intimidation." Code § 18.2-61. "*Attempted* rape includes the intent to engage in sexual intercourse, and some direct, yet ineffectual, act toward its consummation." *Fortune v. Commonwealth*, 14 Va. App. 225, 228 (1992) (emphasis added). Conversely, an accused is guilty of object sexual penetration if he "penetrates the labia majora . . . of a complaining witness" against her will by force, threat or intimidation. Code § 18.2-67.2. Although both offenses must be accomplished against the complaining witness's will by force, threat or intimidation, the offense of attempted rape requires proof of an intent to engage in sexual intercourse coupled with a direct, yet ineffectual act towards its consummation, while object sexual penetration can be accomplished through penetration of a finger into a victim's

- 7 -

labia majora, absent proof of an intent to have sexual intercourse. Thus, the elements of attempted rape are not "identical and necessary" to prove a conviction for object sexual penetration. *Akers*, 31 Va. App. at 528 n.3.

Even so, Castro propounds that because the jury apparently did not believe B.C.'s testimony regarding the attempted rape, it was also required to reject her testimony regarding object sexual penetration. "The fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Taylor v. Commonwealth*, 256 Va. 514, 518 (1998)). Moreover, "[t]he trier of fact is not required to accept a party's evidence in its entirety, but is free to believe or disbelieve, in whole or in part, the testimony of any witness." *English v. Commonwealth*, 43 Va. App. 370, 371 (2004). "[W]e are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). In this case, B.C. testified that Castro forcibly put his fingers in her vagina against her will, and the jury believed her.

In any event, "[j]ury verdicts may *appear* inconsistent because the jury has elected through mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that seems in conflict with the verdict for another charged offense." *Kovalaske v. Commonwealth*, 56 Va. App. 224, 233 (2010) (emphasis added) (quoting *Pugliese v. Commonwealth*, 16 Va. App. 82, 96 (1993)). We have said that "[w]here a jury renders

inconsistent verdicts, 'a search of the trial record in an attempt to reconcile such inconsistency is neither appropriate nor required.'" *Akers*, 31 Va. App. at 529 (quoting *Wolfe v. Commonwealth*, 6 Va. App. 640, 650 (1988)). "As long as the evidence supports both verdicts, they 'will be upheld, despite the apparent inconsistency.'" *Id.* (quoting *Pugliese*, 16 Va. App. at 96). Thus, in this case we must look to all the evidence presented, in the light most favorable to the Commonwealth, and determine whether it sufficiently proves the offense of object sexual penetration, notwithstanding the jury's interpretation of the evidence for the attempted rape. *See Kovalaske*, 56 Va. App. at 233.

The evidence showed that during a heated and extended argument, Castro choked B.C., slapped her face at least twice, and threatened to shoot her before pinning her down on the bed and refusing to let her leave the bedroom. Although B.C. repeatedly told Castro she did not want to have sex with him and begged him to stop, Castro touched her breasts over her clothing, pulled her pants down, and penetrated her vagina with his fingers against her will and without her consent. Indeed, B.C. had injuries on her vagina consistent with blunt force trauma that Cremeans testified could have been caused by digital penetration, and B.C. had other injuries on her body consistent with her version of events. B.C.'s written statement to police reported the same conduct in exacting detail. Rather than deny his actions when B.C. asked why Castro was forcing her to do "sexual stuff," Castro asked if his actions involved what she "usually" let him do. Thus, the evidence sufficiently proved that Castro committed the offense of object sexual penetration. As such, the circuit court did not err in denying the motion to set aside.

II. Castro's Questioning of Cremeans

Castro assigns error to the circuit court's "fail[ure] to permit [Castro] to question the SANE examiner on issues pertaining to consensual sexual intercourse, citing the Rape Shield statute, related to questioning the witness on a specific individual having sexual contact with

- 9 -

[B.C.] recently before or after the alleged sexual assault."[6] However, the circuit court did not, in fact, prohibit Castro from questioning Cremeans on any such issues. While the circuit court may have permitted the use of the unredacted SANE report (a ruling Castro does not assign error to) at a preliminary motion, the circuit court explicitly told Castro that it was "not . . . restrict[ing his] cross-examination" of "other causation" for B.C.'s physical injuries. Furthermore, the circuit court stated that it was taking under advisement whether Castro could ask Cremeans about receiving B.C.'s sexual history for the report and asking B.C. about the last time she had sexual intercourse. Although the circuit court gave Castro "leeway" to "establish a path" whereby he might be able to inquire about the evidence, Castro did not follow that path and instead merely asked Cremeans if the injury to B.C.'s hymen could have been caused by sexual intercourse and whether she could determine when the injuries were inflicted. This Court therefore finds that because Castro failed to lay a foundation for the evidence he wanted to explore, or otherwise request a sidebar to proffer his questions for the circuit court's consideration, his argument fails, and the circuit court did not commit error.

III. Sufficiency of the Evidence

Lastly, Castro argues that the evidence was insufficient to prove his convictions. He specifically asserts that the evidence failed to establish any injury to B.C.'s neck indicating that a strangulation occurred or any corroborating physical evidence of object sexual penetration, and he argues that B.C. was not "otherwise detained to substantiate an abduction." However, Castro did not move to strike the charges or otherwise raise these specific arguments in the circuit court.

---

[6] While at oral argument and within his brief, Castro claims an unredacted version of the SANE report should have been admitted into evidence, he did not include the admissibility of the redacted SANE report in an assignment of error. Therefore, he has waived any argument as to the use of the redacted SANE report. *See* Rule 5A:20.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015).

> In a jury trial, the defendant preserves his objections to the sufficiency of the evidence in a motion to strike at the conclusion of the Commonwealth's case if he elects to not introduce evidence of his own, or in a motion to strike at the conclusion of all the evidence or a motion to set aside the verdict if he does elect to introduce evidence of his own.

*Commonwealth v. Bass*, 292 Va. 19, 33 (2016).

As previously mentioned, Castro did not make a motion to strike any of the charges after the Commonwealth rested its case, and he presented no evidence. While Castro did file a motion to set aside the verdict as to the object sexual penetration charge, he merely argued that the evidence was insufficient for that conviction on the basis that the verdicts were inconsistent. At no point did he argue that the physical evidence failed to prove he committed that particular offense. He has therefore failed to preserve his sufficiency arguments for appeal. Acknowledging this, Castro asks that this Court apply the ends of justice exception to Rule 5A:18 and reverse the judgment of the circuit court.

"'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220-21 (1997)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Bass*, 292 Va. at 27 (quoting *Gheorghiu v.*

- 11 -

*Commonwealth*, 280 Va. 678, 689 (2010)). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)). "In order to avail oneself of the exception, [the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* (alteration in original) (quoting *Redman*, 25 Va. App. at 221). Furthermore, to invoke the "exception when sufficiency of the evidence has been raised for the first time on appeal, an appellant must do more than show that the Commonwealth *failed* to prove an element or elements of the offense." *Id.* In order "to show that a miscarriage of justice *has* occurred, thereby invoking the ends of justice exception, the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Quyen Vinh Phan Le v. Commonwealth*, 65 Va. App. 66, 74 (2015) (quoting *Redman*, 25 Va. App. at 221-22 (1997)).

Castro has failed to carry his burden of proving a manifest injustice in this case, as he fails to demonstrate that he was convicted for a non-offense nor that an element of the offenses did not occur. Under Code § 18.2-51.6, "[a]ny person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation, a Class 6 felony." B.C. testified that, consistent with Castro's threat, she awoke in the early hours of the morning with Castro standing in her bedroom. She explained that when she failed to answer his questions about her sex life "properly," Castro became frustrated and "choked" her by grabbing the middle of her neck and squeezing her throat, causing her difficulty in breathing. When she tried unsuccessfully to push Castro off, B.C. feared that he would kill her. Contrary to Castro's assertion, B.C. had several injuries on her neck consistent

with strangulation. Indeed, Cremeans, an expert in forensic nursing and strangulation, testified that B.C. had a bruise with overlaying abrasions and scratches on the left side of her neck and two bruises on the right side. B.C. also reported to Cremeans that she had trouble breathing when Castro strangled her, which is consistent with Cremeans's definition of strangulation as "any force that restricts . . . the air flow in the neck." Thus, the record does not support that Castro was convicted for a non-offense nor that an element of strangulation did not occur.

Castro also does not make the requisite showing for the offenses of abduction and object sexual penetration. Code § 18.2-47 provides that:

> Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person, authority or institution lawfully entitled to his charge, shall be deemed guilty of "abduction."

"An accused shall be guilty of inanimate or animate object sexual penetration if he or she penetrates the labia majora or anus of a complaining witness . . . against the will of the complaining witness, by force, threat or intimidation . . . ." Code § 18.2-67.2. B.C. testified that after she returned from taking her shower, Castro prevented her from leaving the basement bedroom, slapped her twice in the face, took her phone, and blocked her path to the door and window. She explained that she did not try to walk past Castro because "he would have been able to push [her] away," and when she asked to be "let out" he said, "No. We're going to talk." Castro threatened to shoot her. She then found herself on the bed with Castro on top of her as he pulled her pants down and penetrated her vagina with his fingers. B.C. repeatedly told him she did not want "to do anything with him" as she tried to push him away, and Cremeans observed abrasions to B.C.'s labia minora and possible bruising near her hymen that was consistent with "some sort of trauma." B.C.'s testimony, corroborated by Cremeans's observations, established

that Castro was not convicted for a non-offense or that the evidence proved that an element of either offense did not occur.

Accordingly, this Court declines to consider Castro's claim under the ends of justice exception recognized by Rule 5A:18 and finds that his argument on appeal that the evidence was insufficient to support his convictions is procedurally barred.

## CONCLUSION

Accordingly, we affirm the circuit court's judgment and remand for the sole purpose of correcting the clerical error in the July 18, 2023 order.

*Affirmed and remanded.*