PRESENT: Powell, C.J., Kelsey, McCullough, Chafin, Russell, and Mann, JJ., and Mims, S.J.

ANTONIO TOBIAS CUFFEE

                                                   OPINION BY

v. Record No. 241104                   JUSTICE WESLEY G. RUSSELL, JR.

                                                       APRIL 16, 2026

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Antonio Tobias Cuffee appeals a decision of the Court of Appeals affirming his conviction for possession of fentanyl with the intent to distribute, third or subsequent offense. He contends that the Commonwealth's evidence was insufficient to prove that he knew that one of the substances he possessed was a mixture containing fentanyl. For the following reasons, we affirm the judgment of the Court of Appeals.

I. BACKGROUND

On the evening of September 21, 2020, Officer Aaron Weeks and his backup officer, Officer Erin Cutburth, responded to a call regarding suspected narcotics activity in the parking lot of a bar located in a "high-crime, high-drug" area in the City of Chesapeake. Weeks parked his marked patrol vehicle across the street from the parking lot about 100 yards away and observed the parking lot through binoculars for approximately 20 to 40 minutes. He saw an SUV pull into the lot, after which a gray-colored Kia automobile pulled in next to it. Although Weeks did not see the driver of the SUV getting into the Kia, after a minute or two he saw the SUV driver exiting the Kia from the passenger's side. The SUV driver then walked toward the front of the bar, and the Kia driver backed out of the parking lot and started driving in Weeks' direction.

Weeks followed behind the Kia in his patrol vehicle, until the Kia turned and abruptly pulled over to the side of the road, causing Weeks to pass by. In an attempt to see who was

inside the Kia, Weeks turned around to make another pass. At that point, Weeks observed the driver of the Kia, later determined to be Cuffee, exiting the Kia and standing by the open driver's side door of the car. As Weeks drove past, Cuffee began to walk away from the Kia. Weeks stopped at the next intersection, out of sight, and waited to observe what Cuffee would do next. Cuffee entered the intersection on foot and, when he "made eye contact" with Weeks' marked police vehicle, he turned around and started walking back in the direction of the Kia. Instead of returning to the Kia, however, he walked up to the front of a residence. At that point, Weeks initiated contact with Cuffee and detained him.

Weeks called Cutburth and K-9 Officer Kirby Standridge to assist him. When Cutburth arrived about a minute later, she noticed Cuffee appeared nervous and was holding two phones. Standridge arrived thereafter and conducted an "open-air sniff" on the Kia with his K-9 unit while Weeks got Cuffee's identification and ran it through DMV and law enforcement databases. During the open-air sniff, the K-9 unit alerted at the left rear wheel well of the Kia. When Standridge shined his flashlight into the Kia, he observed a black handgun in plain view on the driver's side floorboard and informed Weeks that there was a firearm in the vehicle.

The officers attempted to handcuff Cuffee, but Cuffee resisted for approximately seven minutes. During the struggle, Cuffee shoved one of his hands into his jacket pocket. Weeks reached into the same pocket to try to remove Cuffee's hand, and he felt Cuffee clutching a drawstring bag. Weeks removed Cuffee's hand and the bag from Cuffee's pocket and discovered the bag contained what appeared to be drugs in individually packaged baggies.

Testing later revealed that the substances in the baggies were, indeed, drugs. Six of the nine baggies contained various amounts of cocaine, a Schedule II drug, in both powder and crack form. Another baggie contained 0.8237 grams of 3,4-methylenedioxy-N-benzylcathinone

2

("BMDP"), a Schedule I drug. Another baggie contained nine blue oval tablets of alprazolam, a Schedule IV drug, commonly known by the brand name Xanax. The last baggie ("Item 9") contained 3.34 grams of a "brown solid material" determined to be a mixture of heroin, a Schedule I drug, and fentanyl, a Schedule II drug.

During Cuffee's arrest, the officers also found keys to the Kia, two cell phones, and two wads of cash containing four $100 bills, eight $50 bills, forty-seven $20 bills, nine $10 bills, nine $5 bills, and eight $1 bills in Cuffee's possession. They also recovered the handgun from the driver's side floorboard of the Kia.

Cuffee was indicted for possession of cocaine with the intent to distribute, third offense;[1] possession of heroin with the intent to distribute, third offense; possession of fentanyl with the intent to distribute, third offense; possession of alprazolam with the intent to distribute; possession of BMDP; possession of a firearm while possessing cocaine with the intent to distribute; possession of a firearm while possessing heroin with the intent to distribute; possession of a firearm while possessing fentanyl with the intent to distribute; possession of a firearm while possessing BMDP; and resisting arrest.

At trial, Detective Ashley Souther testified as an expert in the possession and distribution of controlled substances. She said that a "combination of all of the factors" led her to believe that Cuffee possessed the bulk of the confiscated drugs with the intent to distribute them. Specifically, Souther found that the money recovered from Cuffee's person was significant because people do not usually carry such large quantities of cash, cash is the preferred method of payment in illicit drug transactions, and Cuffee had almost $2,000 in predominately small denominations in his possession. Similarly, Cuffee's multiple cell phones were a significant

_____

[1] Cuffee had two prior convictions for possession of cocaine with intent to distribute.

3

factor because drug dealers often keep two cell phones, one for family and friends and the other for "business" and "users."

The firearm found in the vehicle Cuffee was driving was also significant to Souther. She noted that drug dealers often carry firearms for protection against users and other dealers who could potentially rob them of the large amounts of cash and drugs that they typically carry. Souther also found it significant that the arresting officers found no ingestion devices such as straws, rolled up bills, pipes, or syringes on Cuffee's person or in his vehicle, indicating he likely did not intend to use the drugs himself.

Cuffee's behavior before his arrest also played a role in Souther's findings. She said that, in her experience, users typically get into a dealer's vehicle during a drug transaction, similar to what Weeks observed in the bar parking lot. Furthermore, Cuffee exhibited "evasive behavior" when he abruptly stopped his vehicle at an apparently random house, when he turned around in the intersection after spotting Weeks' patrol vehicle, and when he walked up to a residence that was not his and "just stood there."

Turning to the particular substances found in Cuffee's possession, Souther presented several additional factors that influenced her findings. She testified that, like Cuffee, drug dealers often possess an assortment of controlled substances in various quantities to supply the needs of a variety of users. She opined that the "typical" drug dealer does not specialize in one specific drug, but rather, sells "multiple types of drugs."

In reference to the cocaine specifically, Souther found that the total amount recovered (roughly 47 grams) and the fact that it was divided into multiple baggies suggested that Cuffee did not possess it for personal use. According to Souther, cocaine users typically only use half of a gram to a gram a day, and the amount recovered from Cuffee would be a 47 to 94-day supply

4

for a single user.  Additionally, both powder and crack cocaine were found on Cuffee.  Souther said that crack cocaine can be sold in smaller quantities as opposed to powder, which is typically sold in quantities of no less than half a gram.

Souther opined that the alprazolam found on Cuffee was inconsistent with possession for personal use because the pills were not in a prescription pill bottle and were found with multiple other types of drugs.  Alprazolam is also sometimes sold in conjunction with cocaine to counteract the effects of the cocaine.

Regarding the heroin/fentanyl mixture, Souther noted that, over the last few years, dealers in the relevant market had begun to sell heroin and fentanyl in combination.  The heroin/fentanyl mixture became popular with users because it is stronger than heroin alone, allowing the user to consume less for the same effect.  She testified that, as a result, heroin mixed with fentanyl sells at a higher price than the same amount of heroin alone.  On cross-examination, Souther admitted she could not definitively tell whether a substance contains fentanyl without first sending it to a lab for analysis.

Regarding the 3.34 grams that laboratory analysis had identified as a heroin/fentanyl mixture, she said the amount was inconsistent with possession for personal use.  According to Souther, users of the substance typically use half of a gram to a gram a day and generally use the drugs immediately after they purchase them.  The amount found on Cuffee would last a typical user three and a half to six and a half days.  In her opinion, a "user" would not possess that much of the substance.  Rather, a dealer would purchase an "eight ball" to repackage and sell to multiple users later.  Heroin and heroin mixtures are typically sold in grams.

In contrast to the other drugs found on Cuffee, Souther testified that the BMDP recovered from Cuffee was consistent with personal use because there was only a small amount in one baggie.

After the Commonwealth rested, Cuffee moved to strike the charge for possession of fentanyl with the intent to distribute, arguing that the Commonwealth offered no evidence showing that Cuffee knew there was fentanyl mixed in with the heroin. The circuit court took the motion under advisement.

Cuffee elected not to put on evidence, and the jury subsequently convicted him of all ten charges. At sentencing, the circuit court revisited Cuffee's motion to strike the fentanyl charge and denied it. Cuffee was sentenced to 90 years and 12 months of incarceration with 45 years suspended.

Cuffee appealed to the Court of Appeals, arguing again that the evidence was insufficient to establish beyond a reasonable doubt that he knowingly possessed the fentanyl in the heroin/fentanyl mixture.[2] Of note, he did not challenge the sufficiency of the evidence to establish that he knowingly possessed the other drugs he was convicted of possessing.

Relating to the sufficiency of the evidence to establish that he knowingly possessed the fentanyl, a divided panel of the Court of Appeals affirmed Cuffee's conviction for possession of fentanyl with the intent to distribute. *Cuffee v. Commonwealth*, Record No. 0093-23-1, 2024 Va. App. LEXIS 620, at *2 (Oct. 29, 2024) (unpublished). The majority found that, based on the totality of the direct and circumstantial evidence produced at trial, "a reasonable factfinder could

_____

[2] In his appeal to the Court of Appeals, Cuffee also challenged the circuit court's denial of his motion to strike a juror for cause and the sufficiency of the evidence to establish that he had possessed the firearm officers recovered from the Kia. Neither of those issues is before us in this appeal.

conclude, beyond a reasonable doubt, that as a sophisticated and experienced dealer of various illicit narcotics, Cuffee knew that Item 9 was a mixture of fentanyl and heroin and that he possessed it with the intent to distribute." *Id.* at \*24. The dissenting judge would have held "that the Commonwealth failed to produce evidence sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that the defendant intentionally and consciously possessed the contraband with knowledge of its nature and character." *Id.* at \*39-40 (internal quotation marks and citation omitted).

Cuffee petitioned to this Court, seeking to have his fentanyl conviction overturned on the grounds that the Commonwealth failed to present sufficient evidence to prove he knew Item 9 contained both heroin and fentanyl. We granted his petition and now address his argument.

## II. ANALYSIS

### A. Standard of review

When faced with a challenge to the sufficiency of the evidence supporting a criminal conviction, an appellate court is faced with the limited task of determining "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (quoting *Commonwealth v. Barney*, 302 Va. 84, 97 (2023)). This appellate inquiry begins with the presumption that the decision in the circuit court is correct and cannot "be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). Accordingly, "an appellate court is *required* to review the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and to accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence." *Garrick*, 303 Va. at 182 (internal quotation marks, brackets, and citations omitted). An appellate court may not disregard

7

or discount the inferences that could have been drawn by the factfinder unless the inferences are "so attenuated that they push into the realm of *non sequitur*." *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018)).

In applying these principles to a jury's verdict, we note that "[i]t is, of course, true that a factfinder must base its decision on evidence presented rather than mere surmise or conjecture. However, it is equally true that factfinders, whether jurors or trial judges, do not abandon their common sense or experience in performing their [factfinding] function." *Wynnycky v. Kozel*, 71 Va. App. 177, 203 (2019).

B.  Possession for the purpose of Code § 18.2-248

As pertinent here, Code § 18.2-248 makes it a crime for a "person to . . . possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance." Code § 18.2-248(A). In turn, Code § 18.2-248(C) provides the range of penalties in circumstances where the drug possessed is a Schedule I or II substance such as fentanyl.

Code § 18.2-248 does not set forth a strict liability offense, but rather, requires that the possession of the controlled substance be intentional. Accordingly, to obtain a conviction, "the Commonwealth must produce evidence sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that the defendant intentionally and consciously possessed the contraband with knowledge of its nature and character." *Garrick*, 303 Va. at 183. Here, there is no dispute that Cuffee actually possessed the fentanyl. After all, it was seized from his person having been discovered in a bag he held in his hand, which was in the pocket of the jacket he

was wearing.  Thus, the only question on appeal is whether the evidence was sufficient to prove he was aware of the fentanyl's presence in his pocket.[3]

C.  Knowledge and circumstantial evidence

In proving that a defendant is aware of the nature and character of a substance in his possession, the Commonwealth is not limited to direct evidence, such as a confession or other statement of the accused demonstrating he knew what he possessed.  The Commonwealth may rely on circumstantial evidence because the judicial "inquiry does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'"  *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 512-13 (2003)).  "A conviction may rest on circumstantial evidence alone; in fact, 'in some cases circumstantial evidence may be the only type of evidence which can possibly be produced.'"  *Garrick*, 303 Va. at 183-84 (quoting *Pijor*, 294 Va. at 512).

"A circumstantial fact is admitted on the basis of an inference when the inference is a probable explanation of another fact and a more probable and natural one than other explanations, if any."  *Toler v. Commonwealth*, 188 Va. 774, 780 (1949).  "Most often a circumstantial fact, viewed in isolation, will be insufficient to establish a basis for a conviction.  Appellate courts, however, 'eschew the divide-and-conquer approach, which examines each

---

[3] Cuffee does not argue that the evidence was insufficient to demonstrate that he possessed the heroin/fentanyl mixture with the intent to distribute it or that the evidence was insufficient to prove he possessed heroin with the intent to distribute.  In fact, he concedes the evidence was sufficient to allow the jury to conclude that he possessed the mixture with the intent to distribute and that he was aware the mixture contained heroin.  Rather, his argument on appeal to this Court is only that the evidence failed to establish that he was aware of the presence of fentanyl in the mixture.  Accordingly, the appeal turns on whether the evidence was sufficient to support a conclusion that Cuffee was aware of the presence of the fentanyl.

incriminating fact in isolation[.]'" *Garrick*, 303 Va. at 184 (quoting *Barney*, 302 Va. at 97).

Thus, even if a circumstantial fact alone were insufficient to support a conclusion, its combination with other circumstantial facts and the remaining evidence can be sufficient to allow a rational factfinder to conclude that the Commonwealth has proven its case beyond a reasonable doubt. *Moseley*, 293 Va. at 463.

D. Sufficient evidence, inference, and common sense support the jury's conclusion

Our review of whether the evidence supported the jury's conclusion begins with the observation that the overwhelming evidence before the jury was that Cuffee was an experienced drug dealer. The jury was aware that Cuffee had two prior convictions for possession of cocaine with the intent to distribute, and therefore, was, in fact, an experienced drug dealer. It also cannot be disputed that the evidence was more than sufficient to allow a rational factfinder to conclude that Cuffee was not just a cocaine dealer, but sold all manner of drugs. After all, when arrested, Cuffee had in his possession powder cocaine, crack cocaine, BMDP, alprazolam, and the heroin/fentanyl mixture. As Souther explained, the "typical" drug dealer does not specialize in one specific drug, but rather, sells "multiple types of drugs." Given his possession of all of these controlled substances—what the Commonwealth aptly characterizes as a "veritable pharmacy of drugs in his pocket"—the jury reasonably could conclude that Cuffee was not simply an experienced *cocaine* dealer, but was an experienced *drug* dealer.

The conclusion that Cuffee was a drug dealer was supported by far more than his mere possession of the "veritable pharmacy." Police observed his activity in the parking lot, which was wholly consistent with a drug deal, when they first encountered him. Further, as the Court of Appeals recognized, Souther's unrebutted testimony established that the packaging of the various drugs, the amount of money in Cuffee's possession, the denominations of the bills in

10

Cuffee's possession, the amounts of the drugs, the lack of ingestion devices, the multiple cell phones seized from Cuffee, and his possession of the firearm all supported the conclusion that he was a drug dealer.

Largely acknowledging that these factors allow for the conclusion that he was engaged in drug distribution, Cuffee contends that, by focusing on this evidence, the Court of Appeals conflated evidence of distribution with evidence of knowledge of the nature and character of Item 9. This ignores the obvious truth that the same pieces of evidence may help prove multiple elements of an offense. It is unquestionably true that the referenced evidence amply supported the conclusion that Cuffee intended to distribute most of the controlled substances he possessed. It also is true, however, that these textbook indicia of distribution, coupled with Cuffee's prior convictions, allowed the jury to conclude that Cuffee is not an amateur entering into the drug trade on a lark, but rather, is a drug dealer by profession. From that fact, the jury reasonably could infer that Cuffee was familiar with the relevant drug market.

That familiarity is critical given Souther's unrebutted testimony about the relevant market. She testified that over the preceding few years, dealers had begun selling heroin and fentanyl as a mixture. The heroin/fentanyl mixture apparently is popular with users because it is stronger than heroin alone, allowing the user to consume less for the same effect. Critically, her unrebutted testimony established that heroin mixed with fentanyl sells at a higher price than the same amount of heroin alone.

Because the evidence was sufficient to establish that Cuffee was an experienced drug dealer in the relevant market, the jury reasonably could infer that he was familiar with market trends. As a result, the jury could conclude that Cuffee was aware of the recent development of heroin and fentanyl mixtures being sold, that the mixtures were popular with drug users in the

11

relevant market, and that the mixtures cost more per gram than heroin alone. Thus, even accepting Cuffee's counsel's hypothesis that the evidence allowed for the conclusion that Cuffee did not mix the substances himself,[4] but rather, purchased it from another dealer, the jury reasonably could conclude that Cuffee, as an experienced drug dealer, would have known what he was buying because of the price. Such an inference is reasonable and certainly is not "so attenuated that [i]t push[es] into the realm of *non sequitur*." *Wilkerson*, 304 Va. at 100 (quoting *Perkins*, 295 Va. at 332).[5]

Furthermore, as noted above, the jury was free to apply its common sense to the evidence and the inferences. *See Wynnycky*, 71 Va. App. at 203. It certainly is a common sense notion that a seller of products is familiar with what he is selling. Coupling that common sense idea with both the evidence in this case and the reasonable inferences that can be drawn from that evidence, there was a sufficient basis for the jury's conclusion that Cuffee knowingly possessed the fentanyl in this case. Accordingly, the Court of Appeals did not err in affirming the judgment of the circuit court.

E. Explaining the "reasonable hypothesis of innocence" principle

In challenging the conclusion reached by the jury, the circuit court, the majority of the Court of Appeals panel, and now this Court, Cuffee argues that the evidence did not negate his

---

[4] In this Court, Cuffee concedes if there was evidence that he had created the mixture, the evidence would have been sufficient to establish his knowledge of the fentanyl.

[5] The dissenting judge in the Court of Appeals asserted that, if it is reasonable to infer that an experienced drug dealer possessed sufficient information to satisfy the knowledge requirement, it logically follows that the same would be true about drawing a similar inference for an experienced drug user/buyer. *Cuffee*, 2024 Va. App. LEXIS at *38-39. In this, the dissenting judge very well may be correct. We do not reach that question, however, because the case before us deals with an experienced drug dealer as opposed to a user/buyer. For the reasons stated herein, the inference is reasonable in this case, and therefore, supports the jury's conclusion.

reasonable hypothesis of innocence. He argues that, because he might have purchased the heroin/fentanyl mixture from another dealer, the Commonwealth failed to prove he knew what was in the mixture. Because this argument misapplies the reasonable hypothesis of innocence principle in a manner we see with some frequency, further discussion of it is merited.

"Properly understood, the reasonable-hypothesis principle is not a discrete rule unto itself[,]" but rather, is an attempt to explain the uncontroversial ideas "that circumstantial evidence must exclude every *reasonable* theory of innocence" and that "the Commonwealth has the burden of proof beyond a reasonable doubt." *Vasquez v. Commonwealth*, 291 Va. 232, 249-50 (2016) (emphasis added) (internal quotation marks and citation omitted). Although intended to clarify and explain the Commonwealth's burden of proof in a criminal case, the reasonable hypothesis of innocence concept has, in many cases, confused and bedeviled both the bench and bar.[6]

The reasonable hypothesis formulation only requires that a criminal defendant be acquitted when the evidence provides no reasonable basis for a factfinder choosing between two equally likely options: guilt, on the one hand, and innocence, on the other. As we explained in *Burton v. Commonwealth*, 108 Va. 892, 899 (1908), the reasonable hypothesis formulation "does not leave the jury at liberty to guess, and where a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, they cannot

---

[6] An excellent example of the confusion sown by the reasonable hypothesis of innocence principle can be found in the en banc decision of the Court of Appeals in *Fary v. Commonwealth*, 77 Va. App. 331 (2023) (en banc), *aff'd,* 303 Va. 1 (2024). In *Fary*, the seventeen learned judges of that court expressed wide disagreement over the import and application of the principle with more than four full pages of the majority opinion, 77 Va. App. at 343-47, the entirety of Judge Ortiz's solo concurrence, *id.* at 350-54, and more than eight full pages of the dissent, *id.* at 355-63, dedicated to addressing the concept and the various judges' disagreement over its application generally and in that case specifically.

*arbitrarily* adopt that interpretation which incriminates him." (Emphasis added.) *See also Wright v. Commonwealth*, 292 Va. 386, 399 (2016) (quoting *Burton* and reiterating its recognition that a factfinder may not "arbitrarily" reject a hypothesis of innocence).

That the principle applies only to *reasonable* hypotheses and *arbitrary* rejections of those hypotheses is critical to understanding it. "Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). Thus, the principle recognizes rather than supplants the primary role of the factfinder. If, based on the evidence presented, a jury *reasonably* rejects a proffered hypothesis of innocence, the hypothesis is not a reasonable one. So long as the factfinder's rejection of a proposed hypothesis as unreasonable is not arbitrary, *Burton*, 108 Va. at 899; *Wright,* 292 Va. at 399, the reasonable hypothesis of innocence principle provides no authority for an appellate court to invade the province of the factfinder.[7]

Applying that understanding here, it is clear that the jury's rejection of Cuffee's proffered hypothesis was not arbitrary. For the reasons stated above, there was sufficient evidence to support the conclusion that Cuffee was aware of the fentanyl he carried in his pocket for sale. Because that conclusion was supported by the evidence, the jury's rejection of Cuffee's alternative theory was not arbitrary. *Cf. Miles v. Commonwealth*, 205 Va. 462, 467 (1964)

---

[7] To hold otherwise would alter rather than affirm the idea that the Commonwealth has the burden of proving the elements of the offense beyond a reasonable doubt. If the mere existence of a theoretical possibility of an innocent explanation for the allegedly criminal conduct, no matter how unlikely or remote the factfinder finds that theoretical possibility to be, requires an acquittal, the Commonwealth's burden becomes to prove the elements of the offense beyond all doubt as opposed to beyond a reasonable doubt. That is not the law. *See Barney*, 302 Va. at 98 ("Circumstantial evidence must prove guilt beyond a reasonable doubt but not beyond all doubt.") (internal quotation marks and citations omitted).

("Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded."). Accordingly, Cuffee's proffered reasonable hypothesis of innocence did not entitle him to an acquittal in this case.

## III. CONCLUSION

For the foregoing reasons, the evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that Cuffee was aware of the fentanyl that he held in his pocket for sale. Accordingly, we affirm the judgment of the Court of Appeals.

*Affirmed*.